922 P.2d 555

Christine R. FITZHUGH,
Petitioner–Appellant,

v.

NEW MEXICO DEPARTMENT OF LA-
BOR, EMPLOYMENT SECURITY DI-
VISION, and Prudential Insurance
Company, Respondents–Appellees.

No. 22172.

Supreme Court of New Mexico.

July 18, 1996.

Legal Aid Society of Albuquerque, Inc. Jane Yee, Albuquerque, for Appellant.

Douglas H. McKinnon, Albuquerque, Hinkle, Cox, Eaton, Coffield & Hensley, Margaret R. McNett, Albuquerque, for Appellees.

## *OPINION*

FRANCHINI, Justice.

Christine R. Fitzhugh applied for, and was denied, unemployment compensation. She appealed to the Appeals Bureau of the Department of Labor, Employment Security Division (Department). The Department affirmed the denial of benefits, concluding Fitzhugh voluntarily abandoned her job. She then filed a Petition for Writ of Certiorari seeking judicial review of the administrative decision in district court. The court affirmed the denial of Fitzhugh's unemployment benefits. However, the court rejected the Department's conclusion that Fitzhugh had voluntarily quit her job, and concluded instead that she was justifiably terminated for misconduct. We originally affirmed the trial court's determination. However, upon Fitzhugh's motion for rehearing, we have concluded that the findings of both the Department and the trial court are not supported by law or by substantial evidence. We there-

fore reverse and direct that Fitzhugh be awarded unemployment benefits.

## I. FACTS

■ In October 1990, Fitzhugh began working at the Albuquerque office of the Prudential Insurance Company, having transferred from Prudential's San Diego office. Her excellence as an employee resulted in several promotions. However, within less than a year of her transfer, Fitzhugh was incapacitated by a severe emotional breakdown.

■ Among the first outward indications of Fitzhugh's unhappiness was a written formal complaint against a co-worker filed with the management of the Albuquerque office. In August 1992, Fitzhugh submitted the first of several requests that she be transferred to Prudential's Atlanta office. It was also in August 1992 that the physical symptoms of Fitzhugh's distress became apparent. She experienced headaches, gastrointestinal pain, anxiety, sleep disorders, and depression. On the job, her work began to backlog, she was unresponsive when spoken to, and she exhibited open hostility toward co-workers and supervisors.

■ Fitzhugh first sought medical help on October 7, 1992, from Dr. Joy Lovette. In medical reports and in her testimony Dr. Lovette noted Fitzhugh's feelings of depression, victimization, isolation, and hopelessness.

■ On October 19, 1992, the Albuquerque office manager, Janice Gallimore, met with Fitzhugh. She notified Fitzhugh that she was disruptive to working relationships in the office and that if she did not improve she may be subject to disciplinary action.

■ Fitzhugh, at the recommendation of Dr. Lovette, took off from work from Tuesday, October 20 through Friday October 23, 1992. The following Monday, October 26, 1992, Fitzhugh returned to the office. However, she left early, suffering from stomach pains, a headache, and a "dazed" feeling. Fitzhugh called in sick the next four days, Tuesday, October 27 through Friday, October 30, 1992.

■ At some point between October 26 and 30, Fitzhugh informed her immediate supervisor, Judy Morris, of the extended nature of her illness. She asked Morris for assistance in applying for workers' compensation benefits. This claim was ultimately denied.

■ At the same time, Fitzhugh asked Morris to provide the application forms for a short-term disability program offered by Prudential. Employees who are absent from work for more than four days are required to apply for this program. These disability claims are processed by a special office—or "unit"—located in New Jersey. For the sake of confidentiality, the unit that evaluates disability claims is kept isolated from other units in the Prudential company. For this reason, the Human Resources unit, which handles other personnel matters such as termination of employment, is separately located in California.

■ When Fitzhugh called in sick on Friday, October 30, 1992, the fourth day after her ill-fated attempt to return to work, Morris warned Fitzhugh concerning her excessive absenteeism. She informed Fitzhugh that she may be placed on "final warning" status if she were absent even a few more days. This was apparently an allusion to a formal system of discipline established by Prudential to address employee problems, in which a "final warning" was one step in a series that ended with the employee's discharge. Fitzhugh told Morris she did not know when she would be returning to work. This conversation was the last time Fitzhugh had any direct contact with her Albuquerque supervisors.

■ Gallimore and Morris both testified that Prudential requires an employee who must be absent from work to notify his or her supervisor of the absence on a daily basis. They claimed that this rule applies even if the employee is absent pending action on a disability or workers' compensation application. They asserted that this rule is waived only if the employee provides a note from a physician indicating the length of absence. Fitzhugh testified that she had no knowledge of this policy. Morris testified that she never warned Fitzhugh about this

policy but that it could be found in the company's employee guide.

On November 9, 1992, Fitzhugh apparently received a phone call from Ginny Ordesch, who worked for Prudential's Human Resources unit in California. That unit was in charge of hiring and firing employees for the Albuquerque office. Additionally, though Human Resources did not process disability claims, it did set the deadlines for their submission. Ordesch told Fitzhugh that her short-term disability application must be submitted to the New Jersey unit by November 24.

The short-term disability application required the submission of an "Attending Physician's Statement." Dr. Lovette completed and returned this statement to Fitzhugh on November 12, 1992. In the statement Lovette indicated that Fitzhugh would be unable to work for an "uncertain" period of time, noting that "she will need to have job transfer or some assurance from employer that things will change."

Sometime around November 14, 1992, Fitzhugh mailed the completed short-term disability claim to New Jersey. A return mail receipt showed that the New Jersey unit received the claim by the November 24 deadline.

Fitzhugh claims she made a telephone call to Ordesch at Prudential's California office on December 1, 1992, more than one month after she last spoke to the Albuquerque office. Apparently Ordesch said she was in the process of preparing a letter terminating Fitzhugh's employment, in part because Fitzhugh had not worked for more than a month. Fitzhugh claims she offered to return to work immediately to preserve her employment but Ordesch refused.

Fitzhugh received the letter of termination on December 7, 1992. The letter stated:

Since you have not reported to work since October 26, 1992 ... we interpret this as resignation of your employment and are terminating your services accordingly. This is effective October 26, 1992, the last day you worked.... Should you have any

additional evidence to support your absence, please let us know.

The following day, December 8, 1992, Fitzhugh received a letter from the New Jersey office notifying her of the denial of her short-term disability claim. In contradiction to the letter from California, this letter from New Jersey stated, "We have advised Human Resources of our decision and you should make arrangements to return to work."

On December 11, 1992, Fitzhugh filed a claim for unemployment compensation. On December 29, 1992, the unemployment pre-hearing claims examiner disqualified Fitzhugh from receiving benefits. The examiner determined that Fitzhugh voluntarily quit her job because she thought the work was detrimental to her health, and that such leaving did "not constitute good cause connected with the work." The absence of good cause rendered Fitzhugh ineligible for unemployment compensation.

Fitzhugh filed an appeal to this determination. On February 16, 1993, an administrative hearing on Fitzhugh's claim was held before the Appeals Bureau of the Department. The Appeals Bureau affirmed the denial of Fitzhugh's unemployment benefits, concluding that Fitzhugh voluntarily abandoned her job. The hearing examiner found that

the claimant, shortly after receiving the termination letter, received a letter denying her claim for disability payments and telling her, "We have advised Human Resources of our decision and you should make arrangements to return to work." ... At that point, the claimant abandoned the job by failing to respond to this invitation in any way, either by reporting to work, requesting leave of absence, or following up on her pending request for transfer.

Fitzhugh appealed this decision to the Secretary of Labor where it was once again affirmed.

Fitzhugh filed a Petition for Writ of Certiorari seeking judicial review in district court of the administrative decision. In its March 1, 1994 decision, the district court

rejected the Department's conclusion that Fitzhugh had voluntarily quit her job. The court found instead that Fitzhugh failed to comply with Prudential's "company policy requiring daily or other communication during a long-term absence." The court concluded that Prudential justifiably terminated Fitzhugh for misconduct.

Fitzhugh filed an appeal with this Court. We disagree with the decisions of both the Department and the district court. We reverse and direct that unemployment benefits be awarded to Fitzhugh.

## II. STANDARD OF REVIEW

[21] The district court limited its review of the administrative determination to evidence that was presented to the Appeals Bureau. Similarly, the evidentiary record before us consists entirely of information accumulated at the hearing before the Appeals Bureau. "When reviewing administrative agency decisions courts will begin by looking at two interconnected factors: whether the decision presents a question of law, a question of fact, or some combination of the two; and whether the matter is within the agency's specialized field of expertise." *Morningstar Water Users Ass'n v. New Mexico Pub. Util. Comm'n*, 120 N.M. 579, 582, 904 P.2d 28, 31 (1995).

[22] If an agency decision is based upon the interpretation of a particular statute, the court will accord some deference to the agency's interpretation, especially if the legal question implicates agency expertise. However, the court may always substitute its interpretation of the law for that of the agency's "because it is the function of the courts to interpret the law." *Id.* at 583, 904 P.2d at 32. If the court is addressing a question of fact, the court will accord greater deference to the agency's determination, "especially if the factual issues concern matters in which the agency has specialized expertise." *Id.*

[23] When reviewing findings of fact made by an administrative agency we apply a whole record standard of review. *Duke City Lumber Co. v. New Mexico Envtl. Improvement Bd.*, 101 N.M. 291, 294, 681 P.2d 717, 720 (1984). This means that we look not only at the evidence that is favorable, but also evidence that is unfavorable to the agency's determination. *Trujillo v. Employment Sec. Dep't*, 105 N.M. 467, 470, 734 P.2d 245, 248 (Ct.App.1987). We may not exclusively rely upon a selected portion of the evidence, and disregard other convincing evidence, if it would be unreasonable to do so. *National Council on Compensation Ins. v. New Mexico State Corp. Comm'n*, 107 N.M. 278, 282, 756 P.2d 558, 562 (1988).

[24] The decision of the agency will be affirmed if it is supported by the applicable law and by substantial evidence in the record as a whole. *Kramer v. New Mexico Employment Sec. Div.*, 114 N.M. 714, 716, 845 P.2d 808, 810 (1992). "Substantial evidence" is evidence that a reasonable mind would regard as adequate to support a conclusion. *Wolfley v. Real Estate Comm'n*, 100 N.M. 187, 189, 668 P.2d 303, 305 (1983). If the agency's factual findings are not supported by substantial evidence, the court may adopt its own findings and conclusions based upon the information in the agency's record. *Sanchez v. New Mexico Dep't of Labor*, 109 N.M. 447, 449, 786 P.2d 674, 676 (1990).

[25] The party challenging an agency decision bears the burden on appeal of showing "that agency action falls within one of the oft-mentioned grounds for reversal including whether the decision is arbitrary and capricious; whether it is supported by substantial evidence; and whether it represents an abuse of the agency's discretion by being outside the scope of the agency's authority, clear error, or violative of due process." *Morningstar*, 120 N.M. at 582, 904 P.2d at 31.

The record in this case is inadequate, a problem that greatly complicated and delayed our evaluation of the issues. However, a careful review of the whole record has yielded enough evidence to justify our decision upon rehearing.

## III. STATUTE IN QUESTION

The only issue in this case is whether Fitzhugh is entitled to receive unemployment compensation. The answer to this question is determined by the portion of the

Unemployment Compensation Law, NMSA 1978, §§ 51–1–1 to –58 (Repl.Pamp.1993 & Cum.Supp.1994), that establishes the circumstances under which a person may be denied unemployment benefits:

An individual shall be disqualified for, and shall not be eligible to receive, benefits:

A. if it is determined by the division that he left his employment voluntarily without good cause in connection with his employment; . . .

B. if it is determined by the division that he has been discharged for misconduct connected with his employment.

Section 51–1–7. We conclude that Fitzhugh did not abandon her employment under Section 51–1–7(A), nor was she discharged for misconduct under Section 51–1–7(B). She should therefore be awarded unemployment compensation benefits.

## IV. FITZHUGH DID NOT ABANDON HER EMPLOYMENT WITH PRUDENTIAL

[28] Section 51–1–7(A) suggests a two-part analysis. First, whether Fitzhugh left her employment voluntarily. Second, if we conclude that she quit, whether she did so for good cause in connection with her employment. Since we conclude that she was fired rather than quit, we need only discuss the first part of this analysis. Whether an employee quit or was fired constitutes a question of law. *TBA Supply Co. v. Commonwealth,* 76 Pa.Cmwlth. 231, 463 A.2d 1223, 1224 (1983). This means there is a legal standard by which this question is answered. It is for the court to determine whether the conduct of the parties falls within the parameters of this standard. While we accept the facts established in the factfinding process, we need not be bound by the conclusions drawn from those facts at the administrative hearing or the trial level. In determining whether a claimant voluntarily left his or her job, we will look at the conduct of individuals involved as well as other circumstances surrounding the separation.

Both the Department and Prudential describe as a "directive" the comment in the December 8, 1992 letter from the disability unit that Fitzhugh "should make arrangements to return to work." They argue that, by failing to pursue this "directive" she voluntarily quit her job. Under the facts of this case, this argument is untenable.

[30] Among the most important considerations in resolving whether an employee quit or was fired is an examination of the subjective intentions and understandings of that employee. *County Mkt. v. Dahlen,* 396 N.W.2d 81, 83 (Minn.Ct.App.1986) ("[W]hat is important is the employee's perception of the situation and his or her response thereto."). A finding of voluntary termination usually requires that the claimant had a conscious intention to leave his or her employment. *See Roberts v. Commonwealth,* 61 Pa.Cmwlth. 21, 432 A.2d 646, 648 (1981). Our review of the record indicates that Fitzhugh had no conscious intention to leave her employment with Prudential. Additionally, she believed in good faith that she had been fired. *See TBA,* 463 A.2d at 1224 (where claimant testified she had not quit, court found claimant was involuntarily terminated).

Fitzhugh testified she could not afford to lose her job because she was a single parent supporting two young daughters. She made efforts to preserve her job despite her debilitating illness. On two or three occasions she submitted requests for transfers to Prudential's Atlanta offices, she applied for workers' compensation benefits, and she sought to participate in Prudential's short-term disability program. All of these activities indicate that, though her health prevented her from reporting to work, she still viewed herself as an employee of Prudential. She never expressed any desire to leave her job with the Prudential corporation, rather she sought release from the stresses of the Albuquerque office. *See Maines v. Commonwealth,* 110 Pa.Cmwlth. 601, 532 A.2d 1248, 1251 (1987) (court found claimant had not voluntarily left employment because claimant expressed *no desire to* leave employment).

[32] The language of the letter from the California Human Resources unit, dated December 1, 1992, shows that it was

reasonable for Fitzhugh to conclude that she had been released from employment with Prudential. *County Mkt.*, 396 N.W.2d at 83 (concluding employee "believed in good faith he was fired"). Pennsylvania courts have adopted a useful standard for evaluating the language of an employer's termination notice: "In order for an employer's language to be interpreted as a discharge it must possess the *immediacy* and *finality* of a firing." *Maines*, 532 A.2d at 1250 (emphasis added); *see also Sweigart v. Commonwealth*, 47 Pa. Cmwlth. 421, 408 A.2d 561, 564 (1979) (same statement).

 The "immediacy" element of the December 1 letter is found in the language "[t]his is effective October 26, 1992, the last day you worked." It is hard to imagine a more "immediate" termination than one that takes effect retroactively. The "finality" element is satisfied by the statement, "[We] are terminating your services." This finality is underscored by Fitzhugh's offer to return immediately to work when, on December 1, she spoke to Ordesch. Ordesch flatly refused this offer.

 [34] We reject the notion that Fitzhugh had a "duty" to contact Prudential and resolve the two conflicting letters. When Ordesch refused the offer to return to work, Fitzhugh could reasonably presume any further efforts to contact Prudential would be futile. *McBrearity v. Maine Unemployment Ins. Comm'n*, 529 A.2d 326, 327 (Me.1987) (finding claimant was discharged and was not required to approach management about other employment, when supervisor, despite lack of authority to fire employees, told claimant he was fired).

 [35] Any argument that the letter from the New Jersey disability unit could somehow reverse the California letter of termination is unsupported by the record. There is no dispute that the two units were deliberately kept separate—physically and bureaucratically—in order to assure confidentiality in the processing of disability claims. Also, the New Jersey unit did not have the authority to hire and fire employees. The "directive" from New Jersey to return to work "was not that type of request which would lead an employee, recently fired,

to believe that the job position was once more available." *Unemployment Compensation Bd. of Review v. DiMarco*, 24 Pa. Cmwlth. 328, 355 A.2d 594, 595 (1976).

 [36] Prudential and the Department suggest that Fitzhugh abandoned her job by failing to call Prudential every day of her absence as required by company policy. This concept is called "constructive quitting" or the "doctrine of provoked discharge." *See James v. Levine*, 34 N.Y.2d 491, 358 N.Y.S.2d 411, 411–13, 315 N.E.2d 471, 472 (1974). The concept refers to an employee who, through some willful action or omission, provokes their own discharge. *Id.* We are reluctant to adopt such a rule in this case. Unless the rule were narrowly defined, almost any termination action could be deemed a "constructive quit." In these cases, we are still inclined to look to the subjective intentions of the employee. When an employee does nothing at all to preserve their employment, this may, under a subjective standard, indicate the employee's indifference to continued employment. Then it may fairly be said they voluntarily quit. Fitzhugh was not indifferent. She had taken steps to remain employed by applying for transfers, workers' compensation, and disability.

 We hold as a matter of law that Fitzhugh did not abandon her employment with Prudential.

## V. FITZHUGH WAS NOT TERMINATED FOR MISCONDUCT

 [38] Once it is determined that an employee did not abandon his or her job, it is presumed that he or she was terminated. We now turn to the question of why Fitzhugh was terminated. Under Section 51–1–7(B), an employee may be denied unemployment benefits if "discharged for misconduct connected with his [or her] employment." Prudential and the Department argue that if we conclude Fitzhugh was fired, the record shows that she was fired for misconduct. They claim that she violated the company policy that required her to notify her supervisor on a daily basis of her absence from work. They state that this call-in policy applied even during the pendency of an appli-

cation for disability and was waived only if the employee provided a note from a physician. This misconduct, they allege, is sufficient to warrant a denial of unemployment benefits. We disagree.

[39] An employee's conduct may justify his or her discharge from employment. *Rodman v. New Mexico Employment Sec. Dep't,* 107 N.M. 758, 761, 764 P.2d 1316, 1319 (1988). However, that same conduct may not rise to the level of "misconduct" so as to justify the denial of unemployment benefits. *Id.* To constitute misconduct sufficient to deny benefits, the employee's violation must be evaluated in light of the purposes of the Unemployment Compensation Law, which include easing the burden of involuntary unemployment "which now so often falls with crushing force upon the unemployed worker and his family." Section 51–1–3. In Fitzhugh's case, absenteeism may explain her discharge from Prudential, but standing alone it is not necessarily the kind of misconduct that would render her ineligible for unemployment compensation. *See Atlantic Richfield Co. v. Commonwealth,* 65 Pa.Cmwlth. 65, 441 A.2d 516, 517 (1982). The employer must demonstrate more than the simple fact that the discharge was justifiable in reference to business interests. *Butler v. District of Columbia Dep't of Employment Servs.,* 598 A.2d 733, 734–35 (D.C.1991).

The term "misconduct" is nowhere defined in the Employment Compensation Law. We addressed this omission in *Mitchell v. Lovington Good Samaritan Center, Inc.,* by borrowing a definition from the Wisconsin Supreme Court:

'[M]isconduct' ... is limited to conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in

good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good faith errors in judgment or discretion are not to be deemed 'misconduct' within the meaning of the statute.

*See Mitchell v. Lovington Good Samaritan Ctr., Inc.,* 89 N.M. 575, 577, 555 P.2d 696, 698 (1976) (quoting *Boynton Cab Co. v. Neubeck,* 237 Wis. 249, 296 N.W. 636, 640 (1941)).

In reevaluating this matter upon rehearing, we note that subsequent to *Mitchell,* we further explained the meaning of "misconduct." Most notably, in *Rodman v. New Mexico Employment Security Department* we limited "misconduct" to more egregious behavior than might first be presumed from the *Mitchell* definition. We pointed out that the statutory bar of Section 51–1–7(B) served to deny "benefits to those who bring about their own unemployment by conducting themselves with such callousness, and deliberate or wanton misbehavior that they have given up any reasonable expectation of receiving unemployment benefits." *Rodman,* 107 N.M. at 761, 764 P.2d at 1319. *Rodman* also describes "two components to the concept of misconduct sufficient to justify denial of benefits." *Id.* The first is "the notion that the employee has acted with willful or wanton disregard for the employer's interests. The second "is that this act significantly infringed on legitimate employer expectations." *Id.* (referring to *Alonzo v. New Mexico Employment Sec. Dep't,* 101 N.M. 770, 772, 689 P.2d 286, 288 (1984) and *Trujillo,* 105 N.M. at 472, 734 P.2d at 250).

[42] In order to preclude any further confusion regarding the meaning of "misconduct," we propose a modified definition that incorporates the various elements listed above. The wording of *Rodman* is more definitional, while the language in *Mitchell* exemplifies the type of conduct that warrants denial of unemployment benefits: "Misconduct" is limited to conduct in which employees bring about their own unemployment by such callousness, and deliberate or wanton misbehavior that they have given up any reasonable expectation of receiving unemployment benefits. The employee's actions may evince a wilful or wan-

ton disregard of an employer's interests as is exemplified by deliberate violations of or indifference to the employer's reasonable expectations regarding standards of behavior. The employee's misconduct may demonstrate carelessness or negligence of such degree or recurrence so as to suggest equal culpability, wrongful intent, or evil design, or so as to reveal an intentional and substantial disregard of the employer's interests, or of the employee's duties and obligations to his employer. *See Mitchell*, 89 N.M. at 577, 555 P.2d at 698; *Rodman*, 107 N.M. at 761, 764 P.2d at 1319.

■ [43] In evaluating whether the employee has given up any reasonable expectation of receiving unemployment benefits through conduct that evinces callousness, and deliberate or wanton misbehavior toward the employer's interests and expectations, we look to the "totality of circumstances" of the case. *See Rodman*, 107 N.M. at 762, 764 P.2d at 1320. Relevant "circumstances" can include the employee's past conduct, previous reprimands by the employer, the worker's knowledge of the employer's expectations, the reasonableness of those expectations, and the presence of any mitigating factors. *Id.*

■ [44] The employer bears the burden of proving that the employee was discharged for willful misconduct. *TBA*, 463 A.2d at 1224. Accordingly, Prudential bears the burden of showing that, under the totality of the circumstances of this case, the violation of a company rule constitutes "misconduct" sufficient to disqualify Fitzhugh from unemployment compensation benefits. *See Chavez v. Employment Sec. Comm'n*, 98 N.M. 462, 463, 649 P.2d 1375, 1376 (1982) ("Whether excessive absenteeism, amounts to misconduct ... depends upon the particular facts in each case."). Moreover, we construe the Unemployment Compensation Law as favoring the granting of unemployment benefits. "Given the remedial purpose of the Unemployment Compensation Law, New Mexico courts, like most jurisdictions, interpret the provisions of the law liberally, to provide sustenance to those who are unemployed through no fault of their own, and who are willing to work if given the opportu-

nity." *Rodman*, 107 N.M. at 761, 764 P.2d at 1319.

■ Thus, on rehearing, we are applying a modified legal standard. In order to determine if this modified rule of law sheds new light on the facts of this case we have reexamined the whole record. We have also looked to see if any facts that previously seemed irrelevant, now, under a different legal standard, support the arguments of either party.

■ The record in administrative cases can be characterized by procedural informality and inadequate documentation that would not be acceptable in a trial setting. This case is no exception. The existence of the company's daily call-in policy is established exclusively by the testimony of Morris and Gallimore. We do not have the advantage of examining the written language of this policy. However, the testimony describing this policy is consistent, and Fitzhugh never suggests that its provisions were different from the description offered by Morris and Gallimore. The issue at hand is, despite the fact that Prudential may have been justified in firing Fitzhugh for violating the policy, whether this violation rises to a sufficient level of misconduct to warrant denying unemployment benefits. *See, e.g., Sanchez*, 109 N.M. at 451, 786 P.2d at 678 (stating employee's actions were willful and wanton violation of a reasonable and known rule); *Unemployment Compensation Bd. of Review v. Kells*, 22 Pa.Cmwlth. 479, 349 A.2d 511, 513 (1975) ("[F]ailure to report an illness in the proper manner under company policy does constitute willful misconduct justifying discharge and precluding the recovery of benefits.").

■ [47] When evaluating a company policy, the abstract reasonableness of the policy is less significant than the unreasonableness of the employee who breaches the rule. *Milwaukee Transformer Co. v. Industrial Comm'n*, 22 Wis.2d 502, 126 N.W.2d 6, 12 (1964). Prudential argues that Fitzhugh's violation of the rule does fall within the meaning of "misconduct" in Section 51–1–7(B). The company suggests that Fitzhugh's failure to report her absence each day was a great disservice to the company's interests. They point out that Fitzhugh never spoke to

her Albuquerque supervisors, Morris and Gallimore, after October 30, 1992. Thus, more than an entire month passed before she was terminated by a letter dated December 1, 1992. Prudential claims that from its perspective, Fitzhugh simply disappeared from her place of employment. *See Watkins v. Employment Sec. Admin.*, 266 Md. 223, 292 A.2d 653, 655 (1972) (excessive absenteeism is a willful disregard of appropriate behavior); *Shepherd v. District of Columbia Dep't of Employment Servs.*, 514 A.2d 1184, 1186 (D.C.1986) (stating that "[a]ttendance at work is an obligation which every employee owes to his or her employer").

[48] In *Chavez v. Employment Security Commission* we set forth a rule, borrowed from an A.L.R. annotation, for determining whether employee absenteeism amounted to misconduct: "[P]ersistent or chronic absenteeism, at least where the absences are without notice or excuse, and are continued in the face of warnings by the employer, constitutes wilful misconduct within [Section 51–1–7(B) ]." *Chavez*, 98 N.M. at 463, 649 P.2d at 1376 (quoting C.C. Marvel, *Discharge for Absenteeism as Affecting Right to Unemployment Compensation*, Annotation, 41 A.L.R.2d 1160, § 3 (1955)). This rule will help us determine if Fitzhugh's absenteeism and her violation of the call-in policy qualify as "misconduct" under Section 51–1–7(B). It is true that Fitzhugh's absenteeism could be characterized as persistent and chronic. But the *Chavez* rule mentions two further factors that we must resolve in evaluating Fitzhugh's conduct: whether her absence was without notice or excuse, and whether she had been adequately warned by Prudential.

Prudential implies that the only notice it would accept from Fitzhugh was daily notice in accordance with the company policy. The company argues that when an employee simply disappears for more than a month, it is not reasonable to expect the employer to be aware of the employee's intentions simply because workers' compensation and disability applications are pending. While these arguments may justify terminating Fitzhugh, they do not necessarily justify denying her benefits.

[50] Fitzhugh responds that Morris and Gallimore should have been aware of the reasons for her extended absence because they were helping her apply for workers' compensation and short-term disability. We agree. When an employee asks for worker's compensation, the employer should be aware that the employee is most likely not suffering from a brief illness. Fitzhugh's statement that she did not know when she would be returning to work was express notice to the Albuquerque office of an extended absence. The request for help in filing a short-term disability claim was further notice that it was unreasonable to expect her to return to work any time soon. Fitzhugh reasonably presumed that Morris and Gallimore knew of the extended nature of her illness.

[51] Additionally, even though she did not directly speak to the Albuquerque office, Fitzhugh did pursue activities that demonstrated her belief that she was employed and that she desired to remain so. The record shows that she spoke to Ordesch regarding her short-term disability application on November 9, 1992. She obtained the necessary physician's statement from Dr. Lovette a few days later, and she mailed the completed application around November 14. She knew from the return mail receipt that the short-term disability application had been timely received by the New Jersey office. Thus, under the *Chavez* rule, we do not conclude that Fitzhugh's absences were "without notice or excuse" *Chavez*, 98 N.M. at 463, 649 P.2d at 1376.

Regarding the second factor from *Chavez*, Prudential notes that Fitzhugh had been warned that her absences from work were excessive. In her last conversation with the Albuquerque office, on October 30, 1992, Fitzhugh was warned by Morris that she was in danger of exceeding the number of absences acceptable under company rules. Morris indicated that Fitzhugh would be placed on "final warning" status if her absences continued. Apparently Prudential maintained a progressive discipline system for addressing problems with employees. As with the other corporate policies whose existence is alleged by Prudential, the record is

totally inadequate. We have been offered no company document that demonstrates how this disciplinary system works. Fitzhugh testified that according to her recollection, the system progressed from "counseling to a warning to a final warning and then termination." This suggests that Prudential had a system in which the employee is formally and repeatedly warned before being terminated. If Fitzhugh's testimony conveys a sense of how the system should work, the record suggests it was not followed by Prudential. There is nothing in the record to show that Fitzhugh was ever actually placed on "final warning" status. She was only warned that this might happen.

■ Furthermore, it cannot be decisively claimed that Fitzhugh was notified that her violation of the call-in rule would result in her termination. Morris admitted that she did not directly inform Fitzhugh of the daily call-in rule though she did state that Fitzhugh could find this rule "in her employee guide." Fitzhugh testified that she was unaware of the rule but did not deny its existence:

I didn't know that I would have to call in every single day. That was the furthest thing from my mind at the time because of my illness, just take it one day at a time. But I thought that they understood that I, you know, because of my illness, that I would not be able to come in to work.

Morris pointed out that Fitzhugh had correctly followed this policy the previous year when she provided a physician's note indicating she would be absent for surgery for a specific number of days, thus waiving the need to call in daily. This latter fact does not necessarily logically demonstrate Fitzhugh's understanding of the policy. She may have been totally unaware that the physician's note obviated her need to call in daily.

■ [54] Fitzhugh may have been sufficiently warned of the call-in rule to justify her termination from Prudential. But for the purposes of the Unemployment Compensation Law, the record shows that Fitzhugh believed her efforts to obtain worker's compensation and short-term disability would excuse her failure to report to work despite Morris's warnings. Though her absences may have "continued in the face of warnings

by the employer," we cannot say that Fitzhugh demonstrated the kind of bad faith implicated by the rule propounded in *Chavez*, 98 N.M. at 463, 649 P.2d at 1376.

■ [55] Before we reexamined the legal standard applicable to this misconduct issue, we concluded that the violation of Prudential's daily call-in policy is an example of "disregard of standards of behavior which the employer has the right to expect of his employee." *Mitchell*, 89 N.M. at 577, 555 P.2d at 698. We now conclude this is no longer an appropriate standard. Fitzhugh's absences did not conform to the conduct proscribed by *Chavez*. Moreover, we conclude that her conduct was not "misconduct" under the revised definition set forth above: We cannot say that Fitzhugh's conduct demonstrated callousness, and deliberate or wanton disregard for Prudential's interests and expectations. She may have disappointed those interests and expectations, but her conduct was not wilful, wanton, deliberate, indifferent, extremely or recurrently careless or negligent, or suggestive of culpability, wrongful intent, or evil design. It is important that the trial court made no findings that brought Fitzhugh's conduct within this new legal standard. Fitzhugh engaged in conduct that sufficiently conformed with the company rules as she understood them. She acted as if she wanted to remain employed and believed she was still employed. She did not act as if she had given up any reasonable expectation of receiving unemployment benefits.

## VI. CONCLUSION

■ For the foregoing reasons we conclude Fitzhugh neither abandoned her employment with Prudential under Section 51–1–7(A) nor was she terminated from her position for misconduct under Section 51–1–7(B). We reverse the decision of the trial court and direct that Fitzhugh be awarded unemployment compensation benefits.

**IT IS SO ORDERED.**

RANSOM and MINZNER, JJ., concur.