This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**No. A-1-CA-40199**

**JUSTIN VERMILLION,**

Petitioner-Respondent,

v.

**NEW MEXICO DEPARTMENT OF
WORKFORCE SOLUTIONS,**

Respondent-Petitioner

and

**TRIAD NATIONAL SECURITY, LLC,**

Respondent-Petitioner.

**APPEAL FROM THE DISTRICT COURT OF LOS ALAMOS COUNTY
Jason Lidyard, District Court Judge**

Michael Schwarz
Santa Fe, NM

for Respondent

Andrea Christman
Rachael Rembold
Albuquerque, NM

Bardacke Allison LLP
Justin Miller
Cole Wilson

for Petitioners

**MEMORANDUM OPINION**

**BACA, Judge.**

**{1}**     The New Mexico Department of Workforce Solutions (the Department) and Triad National Security, LLC (Triad) appeal the district court's reversal of the determination by the Department's Board of Review (the Board) that Justin Vermillion was ineligible for unemployment compensation benefits because he was discharged for misconduct. The Department and Triad argue that the district court erred when it concluded that the Board's determination was not supported by substantial evidence and was contrary to law. Agreeing with the Department and Triad, we affirm the decision of the Board and reverse the district court.

**{2}**     Because this is an unpublished memorandum opinion written solely for the benefit of the parties, *see State v. Gonzales*, 1990-NMCA-040, ¶ 48, 110 N.M. 218, 794 P.2d 361, and the parties are familiar with the factual and procedural background of this case, we omit a background section and leave the discussion of the facts for our analysis of the issues.

**DISCUSSION**

**I.     Standard of Review**[1]

**{3}**     We review an administrative order in the same manner "as the district court sitting in its appellate capacity, while at the same time determining whether the district court erred in the first appeal." *Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 16, 133 N.M. 97, 61 P.3d 806. We review the Board's decision to determine whether "(1) the board of review . . . acted fraudulently, arbitrarily, or capriciously; (2) based upon the whole record on appeal, the decision of the board of review . . . is not supported by substantial evidence; or (3) the action of the board of review . . . was outside the scope of authority of the agency." Rule 1-077(J) NMRA; *see* Rule 1-077(L). In this instance, the parties do not argue that the Board acted outside its scope or fraudulently. Therefore, our focus is on whether the Board's decision was supported by substantial evidence and whether it was arbitrary or capricious.

**{4}**     "When reviewing administrative agency decisions courts will begin by looking at two interconnected factors: whether the decision presents a question of law, a question of fact, or some combination of the two; and whether the matter is within the agency's specialized field of expertise." *Fitzhugh v. N.M. Dep't of Lab.*, 1996-NMSC-044, ¶ 21, 122 N.M. 173, 922 P.2d 555 (internal quotation marks and citation omitted). "If an

---

[1]In seeking to uphold the district court's reversal of the Board's determination that the basis of his discharge from employment precluded eligibility for unemployment compensation benefits, Vermillion dedicates nearly seven pages of his answer brief to arguing that there is ambiguity as to the whole record standard of review and uses that alleged ambiguity to assert that reviewing courts have, or should have more leeway to make their own determinations. We reject Vermillion's assertions as they conflict with New Mexico's clear prohibition on appellate courts reweighing evidence and substituting their judgment when conducting a whole record review. *See Herman v. Miners' Hosp.*, 1991-NMSC-021, ¶ 10, 111 N.M. 550, 807 P.2d 734 ("Whole record review is not an excuse for an appellate court to reweigh the evidence and replace the fact finder's conclusions with its own.").

agency decision is based upon the interpretation of a particular statute, the court will accord some deference to the agency's interpretation, especially if the legal question implicates agency expertise." *Id.* ¶ 22. "However, the court may always substitute its interpretation of the law for that of the agency's because it is the function of the courts to interpret the law." *Id.* (internal quotation marks and citation omitted). "If the court is addressing a question of fact, the court will accord greater deference to the agency's determination, especially if the factual issues concern matters in which the agency has specialized expertise." *Id.* (internal quotation marks and citation omitted).

{5}     "When reviewing findings of fact made by an administrative agency we apply a whole record standard of review." *Id.* ¶ 23. "This means that we look not only at the evidence that is favorable, but also evidence that is unfavorable to the agency's determination." *Id.* Said another way, "[w]e may not exclusively rely upon a selected portion of the evidence, and disregard other convincing evidence, if it would be unreasonable to do so." *Id.*

{6}     "The decision of the agency will be affirmed if it is supported by the applicable law and by substantial evidence in the record as a whole." *Id.* ¶ 24. "'Substantial evidence' is evidence that a reasonable mind would regard as adequate to support a conclusion." *Id.* "If the agency's factual findings are not supported by substantial evidence, the court may adopt its own findings and conclusions based upon the information in the agency's record." *Id.*

## II.     Misconduct in Unemployment Compensation Law

{7}     Our Unemployment Compensation Law requires that an individual be disqualified from eligibility to receive benefits "if it is determined by the [Department] that the individual has been discharged for misconduct connected with the individual's employment." NMSA 1978, § 51-1-7(A)(2) (2011). While an employee's conduct may justify discharge from employment, "that same conduct may not rise to the level of 'misconduct' so as to justify the denial of unemployment benefits." *Fitzhugh*, 1996-NMSC-044, ¶ 39. "To constitute misconduct sufficient to deny benefits, the employee's violation must be evaluated in light of the purposes of the Unemployment Compensation Law, which include easing the burden of involuntary unemployment 'which now so often falls with crushing force upon the unemployed worker and his family.'" *Id.* (quoting NMSA 1978, § 51-1-3 (1936)). "Consistent with Section 51-1-3," New Mexico courts are to "construe[] the Unemployment Compensation Law liberally in favor of employees to afford them the benefits intended by law." *Perez v. N.M. Dep't of Workforce Sols.*, 2015-NMSC-008, ¶ 12, 345 P.3d 330. For these reasons, our Supreme Court has recognized that "the statutory term 'misconduct' should not be given too broad a definition." *Rodman v. N.M. Emp. Sec. Dep't*, 1988-NMSC-089, ¶ 13, 107 N.M. 758, 764 P.2d 1316.

{8}     With those principles in mind, our Supreme Court has held that "'[m]isconduct' is limited to conduct in which employees bring about their own unemployment by such callousness, and deliberate or wanton misbehavior that they have given up any

reasonable expectation of receiving unemployment benefits." *Fitzhugh*, 1996-NMSC-044, ¶ 42. "The employee's actions may evince a wil[l]ful or wanton disregard of an employer's interests as is exemplified by deliberate violations of or indifference to the employer's reasonable expectations regarding standards of behavior." *Id.* "The employee's misconduct may demonstrate carelessness or negligence of such degree or recurrence so as to suggest equal culpability, wrongful intent, or evil design, or so as to reveal an intentional and substantial disregard of the employer's interests, or of the employee's duties and obligations to his employer." *Id.*

**{9}** "In evaluating whether the employee has given up any reasonable expectation of receiving unemployment benefits through conduct that evinces callousness, and deliberate or wanton misbehavior toward the employer's interests and expectations, we look to the 'totality of circumstances' of the case." *Id.* ¶ 43. "Relevant 'circumstances' can include the employee's past conduct, previous reprimands by the employer, the worker's knowledge of the employer's expectations, the reasonableness of those expectations, and the presence of any mitigating factors." *Id.* Accordingly, it was Triad's burden to demonstrate "that, under the totality of the circumstances of this case, the violation of a company rule constitute[d] 'misconduct' sufficient to disqualify [Vermillion] from unemployment compensation benefits." *Id.* ¶ 44.

**{10}** Because "[m]isconduct is a question of fact to be determined from all the attendant circumstances," *Sanchez v. N.M. Dep't of Lab.*, 1990-NMSC-016, ¶ 17, 109 N.M. 447, 786 P.2d 674, we begin by setting out the findings of the Board.

### III.   The Board's Findings

**{11}** Based on the record before it, the Board made the following findings.

**{12}** While employed by Triad as a Cyber Counterintelligence Officer, Vermillion met a woman on an online dating application and started a relationship with her. Vermillion regularly communicated with the woman from May 2020 through June 2020. In June 2020, Vermillion escalated his interactions with the woman to in-person meetings. In July 2020, Vermillion's interactions with the woman escalated to an intimate relationship. Through Vermillion's interactions with the woman, he identified her as a foreign national from a sensitive country. While engaged in these interactions with the woman, Vermillion knew or at least suspected that there was reason to be concerned about the appropriateness of his relationship with the woman because he initiated an investigation into her background.

**{13}** Triad has a policy requiring the reporting of any personal or professional relationship with a foreign national from a sensitive country. Additionally, Triad has multiple policies defining conflicts of interest and prohibiting any actions that could even be perceived as a conflict. Based on his position with Triad, Vermillion had a heightened responsibility to be aware of the policies and his circumstances. Vermillion was aware of the policies, but he alleged that none were clear in defining "personal relationship." It is

unreasonable to assert that the relationship between Vermillion and the woman was not a "personal relationship."

{14} Due to his position with Triad and the high-level security clearances he held, Vermillion had access to classified materials and databases. Vermillion used his position and clearances to access classified databases to search for information about the woman and to create a person record for her.[2] When his search left him with unanswered questions, Vermillion reached out to a work contact at the Department of Homeland Security (DHS) to further inquire about the woman without disclosing that it was a personal inquiry into his then prospective intimate partner. This gathering of information was outside his day-to-day work responsibilities.

{15} Vermillion claimed that he was only conducting the investigation into the woman "out of an abundance of caution" and denied that he had a personal relationship with the woman until it became intimate. When the relationship became intimate, Vermillion reported it to Triad. Shortly thereafter, Vermillion was terminated for misuse of authority and violation of Triad's code of conduct.

## IV.    The Board's Findings Are Supported by Substantial Evidence and Its Misconduct Determination Is Not Arbitrary, Capricious, or Contrary to Law

{16} Before the Board and again on appeal, Vermillion acknowledges that he was aware of the policies restricting the use of classified information to legitimate work purposes. Vermillion argues, however, that none of these policies were clear in defining "personal relationship." The problem with Vermillion's argument is that Vermillion misunderstands the nature of the misconduct Triad alleged and the Board found as the basis for denying him unemployment benefits. Vermillion's focus on when his personal relationship began makes sense only if he was dismissed for failure to timely report a personal relationship with a sensitive national. This, however, was not the reason for his discharge relied on by Triad. Triad claimed before the Board and again on appeal that Vermillion was discharged for using DHS and accessing classified national intelligence databases to investigate the background of an individual with whom he either was contemplating a personal relationship or was already involved in such a relationship. The evidence shows that this was not an authorized work-related reason for contacting DHS or accessing the classified national intelligence database. Whether or not a personal relationship already existed, obtaining information from a restricted classified national intelligence database for personal reasons was not authorized by Triad policy, and Vermillion admitted he knew that.

{17} The evidence shows that Vermillion initiated the creation of a person record for the woman, and then proceeded to obtain additional information about the woman through Triad's relationship with DHS, for a personal reason not authorized by Triad policy. Whether or not the relationship was already personal in nature, Vermillion does

---

[2]Throughout the underlying proceedings, this was referred to variously as a "person record" and "personnel record." For consistency and clarity, we refer to it as "person record" as Vermillion and his supervisor did in the record.

not deny knowing that both contact with DHS and access to the data in the classified national intelligence database were highly sensitive and highly restricted privileges, that he had only for certain job-related purposes and that investigating someone he was interested in or was already in a personal relationship with was not among them. It was on this basis that Vermillion's employment was terminated and it was this conduct that we find Triad demonstrated was misconduct.

**{18}** The Board's findings are supported by evidence in the record. Support for the findings is found in the testimony of Vermillion and a Human Resources-Employee Relations (HR-ER) representative from Triad, as well as admitted portions of a memorandum from Triad's HR-ER regarding an investigation into Vermillion's conduct that concluded with his termination.[3] We detail this evidence below.

**{19}** Vermillion testified as to how he met the woman, how their relationship unfolded, his use of classified databases and professional contacts to search for information on the woman, and the timing of those events. Vermillion's testimony on those topics was corroborated by a signed statement within the HR-ER memorandum from Vermillion's supervisor, who had debriefed Vermillion about his contacts with the woman and his searches for information about her. It was also corroborated by Vermillion's own signed statement to HR-ER, emails that were collected during the course of HR-ER's investigation into Vermillion's conduct, and the contact report Vermillion submitted to his employer, all of which were part of the admitted portion of the HR-ER memorandum.

**{20}** Triad's ethics and conflict of interest policies were admitted into the record. An HR-ER representative from Triad testified that Vermillion was aware of, and trained on those policies. Vermillion confirmed as much in his testimony. Vermillion also confirmed in his testimony that he understood that those policies applied to him. The HR-ER representative testified as to the broadness of the conflict of interest policy  and that the ethics policy required the exercise of personal judgment because it is not possible to outline every type of misconduct that might occur. The HR-ER representative emphasized the high level of trust and confidence given to individuals dealing with matters of national security, including counterintelligence officers like Vermillion.

**{21}** The HR-ER representative testified that Vermillion misused his official authority and access related thereto to search for information on the woman, which was a violation of Triad's ethics and conflict of interest policies. Additionally, the HR-ER representative testified that Triad employees need to have a legitimate business reason to seek information from a classified database, and Vermillion had no such reason when he searched the database for information about the woman. The HR-ER representative further testified that Vermillion's misuse of authority and access carried significant

---

3The memorandum was admitted over Vermillion's objection, which was based in part on the legal residuum rule. While Vermillion did not challenge the admission of this evidence in his appeals to the Board or his appeal to the district court, Vermillion resurrects his legal residuum rule objections in his brief to this Court. To the extent that Vermillion's resurrected objections are proper, we disagree with his analysis as to its application here. *See Duke City Lumber Co. v. N.M. Env't Improvement Bd.*, 1984-NMSC-042, ¶¶ 18-20, 101 N.M. 291, 681 P.2d 717 (discussing the interplay between the relaxed rules of procedure in administrative hearings, whole record review, and the legal residuum rule).

reputational consequences for Triad with their federal partners. The concerns about Vermillion's misuse of authority and access as well as concerns to reputational consequences were echoed in a statement from Vermillion's supervisor. Vermillion's supervisor characterized Vermillion's behavior as an embarrassment to the office of counterintelligence and to Los Alamos National Laboratory. In fact, the supervisor reached out to DHS to apologize for Vermillion's actions. Vermillion's testimony acknowledged that his supervisor was uncomfortable with the situation and would be forwarding the matter to HR-ER for review.

{22}   Further, the record suggests that Vermillion himself knew that what he had done was improper. In an email dated July 9, 2020, from Vermillion to other Triad employees, Vermillion wrote, "New girlfriend is a [sensitive country foreign national] I already entered her stuff high side before thinking [that] I should probably not enter my own contact." Similarly, in the contact report dated July 9, 2020, which Vermillion submitted to Triad reporting his contact with the woman, Vermillion wrote, "I already input her info[rmation] on the high side before thinking I probably shouldn't enter my own contact report." Additionally, in an email dated July 30, 2020, from Vermillion's supervisor to another Triad employee, the supervisor wrote, "[Vermillion] told me he probably should not have done it."

{23}   As to Vermillion's credibility, our review of the record reveals that Vermilion was found not credible by Triad's HR-ER investigation of this incident. In its memorandum concerning this investigation, HR-ER stated,

> HR-ER did not find Vermillion's explanation that [the woman] was a random stranger when he entered her information into the system and he would have done the same thing for any random stranger to be credible. While he claims this is a standard response to a random interaction with a sensitive foreign national, he has never had the situation arise before and HR-ER finds he is offering the explanation in an attempt to rationalize his actions in looking up information for a person he was interested in dating.

Additionally, an HR-ER representative involved in the investigation testified as follows:

Attorney:   Okay, [witness] did you also interview . . . Vermillion?

Witness:   We did.

Attorney:   And what was your impression of [Vermillion's] reaction to the allegation against him?

Witness:   [Vermillion] did not have ownership that anything that he had done was wrong in this instance; he continued to adhere to his stance that he had done nothing wrong. It was somewhat, you know, I think there's parts of his statement that we did not find to be credible so, for instance he made

the statement that when he created the person record and I believe this is in his written statement that the woman he had met was no more than a random strange[r] to him, however, it would not make sense that he would create a person record on a random stranger. Further, obviously he met her on a dating app which would have indicated an intent to at least pursue some kind of dating relationship which in fact it happened in this case.

**{24}** As required by our standard of review, we now turn to information in the record that also cuts against the Board's findings. Most of that information was provided by Vermillion, either in response to Triad's investigation into his conduct or in testimony in the proceeding before the Board. Also cutting against the Board's misconduct determination is documentation of a service award given by Triad to Vermillion in 2019 and his only performance review. We expand on this evidence below.

**{25}** As to his choice to enter the person record for the woman, Vermillion stated he did so "out of an abundance of caution."

**{26}** As for his search of information about the woman, Vermillion provided the following. Per a coworker, reaching out to DHS for information on the woman was "an appropriate course of action," and from Vermillion's perspective was "just a normal part of [his] daily job." Further, nothing in the training he received on Triad's ethics policy indicated that his contacting DHS about the woman was inappropriate. Vermillion never used any of the information provided by DHS for personal purposes, including to further his relationship with the woman. Vermillion's supervisor had told him that his behavior did not violate any policies, procedures, or laws.

**{27}** In addition to the foregoing, the record contains a service award recognizing Vermillion's "outstanding contributions to the Office of Counterintelligence" that he testified was given to him toward the end of 2019 and a favorable year-end performance review for the 2019 fiscal year. Consistent with the award and performance review, Vermillion testified that had never received any verbal or written warnings before the subject events occurred.

**{28}** Next, we briefly address the district court's decision. The district court did "not find substantial evidence to support the [Board's] conclusion that there was misconduct" and entered its own findings of fact and conclusions of law. Such procedure can be appropriate when the Board's factual findings are not supported by substantial evidence. *See Fitzhugh*, 1996-NMSC-044, ¶ 24 ("If the agency's factual findings are not supported by substantial evidence, the court may adopt its own findings and conclusions based upon the information in the agency's record."). Here, however, it is not clear that the district court properly applied the whole record standard of review. Notably, the district court's decision does not discuss any evidence supporting the Board's misconduct findings. *See id.* ¶ 23 ("[Whole record review] means that we look not only at the evidence that is favorable, but also evidence that is unfavorable to the

agency's determination."); *id.* ("[An appellate court] may not exclusively rely upon a selected portion of the evidence, and disregard other convincing evidence, if it would be unreasonable to do so."). For that reason, the district court appears to have reviewed the record and determined on its own, irrespective of the Board's decision, whether Triad had established Vermillion's misconduct. Such constitutes an improper departure from the standard of review.

**{29}** Additionally of significant import to our determination to reverse the decision of the district court is its finding that "[b]ased on the information and . . . Vermillion's activities, it is *just as likely* he did [it] for business purposes and to conclude that it was for personal reasons when the evidence could *lean either way*, indicates that the decision was arbitrary and that the [Board] simply chose one of a variety of options that were *equally* as substantiated." Making a choice between two rational options is not arbitrary. *See Perkins v. Dep't of Hum. Servs.*, 1987-NMCA-148, ¶ 20, 106 N.M. 651, 748 P.2d 24 ("Where there is room for two opinions, the action is not arbitrary or capricious if exercised honestly and upon due consideration, even though another conclusion might have been reached."); *Trujillo v. Emp. Sec. Dep't*, 1987-NMCA-008, ¶ 18, 105 N.M. 467, 734 P.2d 245 ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." (internal quotation marks and citation omitted)). For these reasons and those that follow, we reverse the district court.

**{30}** It is clear from the Board's decision that it did not find Vermillion to be credible. The majority of the information provided by Vermillion, either as testimony at the hearing or a signed statement to HR-ER was discredited by the Board. In fact, it appears that the Board only credited Vermillion's timeline of his contact with the woman and his actions taken in collecting information on the woman. The Board's findings rejected Vermillion's attempts to explain his actions, downplay the significance of his actions, question the clarity of the policies, and minimize the training and guidance he received on the policies. In fact, the Board specifically stated in its findings that "it cannot be reasonably stated that the relationship between the woman and [Vermillion] did not rise to the level of a personal relationship." It was squarely within the Board's purview to weigh the credibility of Vermillion's testimony. *See Garcia v. Borden, Inc.*, 1993-NMCA-047, ¶¶ 15-16, 115 N.M. 486, 853 P.2d 737 (stating that credibility determinations are for the agency and those determinations are not for the appellate courts to reweigh); *Trujillo*, 1987-NMCA-008, ¶ 27 ("It is not the function of reviewing courts to determine the credibility of witnesses."); *Jaynes v. Wal-Mart Store No. 824*, 1988-NMCA-076, ¶ 8, 107 N.M. 648, 763 P.2d 82 ("It is for the trier of fact to weigh the evidence, determine the credibility of witnesses, reconcile inconsistent statements of the witnesses, and determine where the truth lies."). Thus, the district court should not have and we will not disturb the Board's credibility determination on appeal.

**{31}** Next, we note that Vermillion has maintained that his conduct should be analyzed as a single act for purposes of the misconduct analysis. *See Sanchez*, 1990-NMSC-016, ¶ 19 ("It is possible for a single act to meet [the misconduct] standard where that one act significantly affects the employer's interests and the policy behind the rule is

reasonable and is known to the employee."). The Board, however, based its misconduct analysis on a number of separate acts taken by Vermillion, including, but not limited to (1) taking advantage of his position as a cyber counterintelligence officer with high-level security clearances to access classified databases for the unauthorized, nonbusiness gathering and storing of information about the woman, who Vermillion met on a dating application and with whom he developed an intimate relationship; (2) contacting DHS to obtain additional information on the woman; and (3) failing to disclose to DHS that the woman was Vermillion's prospective girlfriend. Based on the record before us, we cannot say that the Board's use of a variety of separate acts by Vermillion in its misconduct analysis was in error.

**{32}** With those considerations in mind, we turn to our conclusions that the Board's findings are supported by substantial evidence and not contrary to law, arbitrary, or capricious. The evidence cutting against the Board's misconduct finding after disregarding Vermillion's discredited testimony, as we must under our standard of review, *see Garcia*, 1993-NMCA-047, ¶¶ 15-16, is slim. All that remains is Vermillion's favorable past work history as demonstrated by an award, a favorable year-end performance review, and no previous warnings or reprimands. While those are clearly important considerations as we look at the totality of circumstances, *see Fitzhugh*, 1996-NMSC-044, ¶ 43, we cannot say such evidence overcomes the evidence in the record supporting the Board's findings that are set forth in detail above. For that reason, we conclude that substantial evidence supports the Board's findings. *See id.* ¶ 24 ("'Substantial evidence' is evidence that a reasonable mind would regard as adequate to support a conclusion."). Further, the Board's findings support a conclusion that Vermillion brought about his unemployment through conduct that demonstrated "carelessness or negligence of such degree or recurrence so as to suggest equal culpability, wrongful intent, or evil design, or so as to reveal an intentional and substantial disregard of the employer's interests, or of the employee's duties and obligations to his employer." *See id.* ¶ 42. In fact, even if we accepted Vermillion's contention that his conduct should be analyzed as a single act, the Board's findings support a conclusion that his conduct "significantly affect[ed Triad's] interests and the policy behind the rule is reasonable and [was] known to [Vermillion]." *See Sanchez*, 1990-NMSC-016, ¶ 19. Accordingly, we cannot say that the Board's misconduct determination was contrary to law. Finally, we cannot describe the Board's misconduct determination as arbitrary or capricious as it was reasonable and rationally supported by the record. *See Law v. N.M. Hum. Servs. Dep't*, 2019-NMCA-066, ¶ 11, 451 P.3d 91 ("A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record." (internal quotation marks and citation omitted)).

**CONCLUSION**

**{33}** For the reasons stated above, we affirm the Department and reverse the district court.

**{34} IT IS SO ORDERED.**

**GERALD E. BACA, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**JANE B. YOHALEM, Judge**