813 P.2d 485

STATE of New Mexico, Plaintiff–Appellee,

v.

Terry HEARNE, a/k/a Terrill B. Hearne, Defendant–Appellant.

No. 12377.

Court of Appeals of New Mexico.

April 25, 1991.

Certiorari Denied June 3, 1991.

Tom Udall, Atty. Gen. and Bill Primm, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Jacquelyn Robins, Chief Public Defender and Gina Maestas, Asst. App. Defender, Santa Fe, for defendant-appellant.

## OPINION

ALARID, Chief Judge.

Defendant appeals his conviction for making or permitting a false public voucher. He raises three issues on appeal: (1) whether the funds from which payment to defendant was made were public or private; (2) assuming the funds were private, whether there was sufficient evidence supporting the conviction; and (3) whether the trial court erred in denying defendant certain discovery. Our second calendar notice proposed summary affirmance. Defendant has filed a memorandum in opposition to the second calendar notice. Not persuaded by the memorandum, we affirm.

FACTS

Defendant is a former associate athletic director at the University of New Mexico

(the University). He was charged with eight counts in an indictment that also included charges against his former boss, Athletic Director John Koenig, and Michael Dill, another associate athletic director. On November 20, 1987, defendant was in San Diego attending a football game between UNM and San Diego State University. He was given $30.00 for meal money by the athletic department. Defendant had received permission from Dr. Koenig to take his family to dinner in San Diego as a reward for his hours. The meal was not an expenditure normally authorized by statute or University policy. The meal expense of $82.44 was charged to the athletic director's "discretionary account," with Dr. Koenig's approval.

The discretionary account is an account funded by donations received from the "Lobo Club," an organization of boosters who primarily support University athletics through fund raising. At that time, the athletic director had authority to use funds from the discretionary account and there were no guidelines concerning how the account was to be used. At the time of the San Diego trip, Dr. Koenig had sole authority for approval of expenditures from the account. Traditionally, the discretionary account was used to fund overages in travel expenses and per diem allotments that were not otherwise permitted by state statute or by University policy. Evidence at trial indicated that the discretionary account was used for such diverse purposes as liquor, Christmas decorations, and shoes for the cheerleaders. There was also evidence that funds from the account were used to offset overages for travel expenses.

Defendant attended dinner at a restaurant in San Diego with his wife, Cheryl, and his parents, Wayne and Gladys Hearne. On December 8, 1987, defendant submitted a voucher requesting reimbursement of $82.44 for the meal. The voucher was approved by Dr. Koenig, to be paid from the discretionary account. On the back of the credit card slip for the meal, defendant placed the following notation: Terry Hearne, Cheryl Hearne, Wayne and Gladys Hicks—San Diego, Gabe Ortiz and Vicki Fisher—San Diego State University. Ortiz and Fisher were employees of the athletic department of San Diego State University. They did not attend the dinner in San Diego. Wayne and Gladys Hicks are defendant's parents. Hicks is defendant's mother's maiden name. Defendant testified that the reason he placed the names of Fisher, Ortiz, and the Hicks on the meal receipt was to avoid problems with personnel in the accounting department with whom the athletic department had disagreements concerning payment of vouchers. Defendant testified that he did not intend to defraud, inasmuch as he had already received approval for the expense. Defendant was convicted of one count of making or permitting a false public voucher and was given a deferred sentence.

DISCUSSION

■ Initially, defendant has informed this court that, during the pendency of this appeal, the trial court entered an order of dismissal of the charge based on defendant's having completed the requirements in the order deferring sentence. Nevertheless, defendant argues that his appeal is not affected. We agree. Notwithstanding the dismissal, defendant's conviction may be used in future habitual offender proceedings. *Padilla v. State*, 90 N.M. 664, 568 P.2d 190 (1977).

I. WERE THE DISCRETIONARY ACCOUNT FUNDS "PUBLIC MONEY?"

NMSA 1978, Section 30–23–3 (Repl. Pamp.1984), provides in part:

Making or permitting false public voucher consists of knowingly, intentionally or willfully making, causing to be made or permitting to be made, a false material statement or forged signature upon any public voucher, or invoice supporting a public voucher, with intent that the voucher or invoice shall be relied upon for the expenditure of *public money*. (Emphasis added.)

Defendant challenges the trial court's finding that the funds in the discretionary account are public money within the contours of the statutory proscription. The

trial court's finding will be upheld if it is supported by substantial evidence. *See State v. Anderson,* 107 N.M. 165, 754 P.2d 542 (Ct.App.1988).

Defendant advances three arguments in support of his contention. First, he argues the source of the funds placed in the discretionary account demonstrates that the funds are not public money. Second, he argues the evidence established at trial demonstrates that expenditures from the discretionary account were used for purposes contrary to controlling University policy and for this reason cannot be considered public money. Third, he argues that because the athletic director maintained sole signatory authority over the discretionary account and no review of the propriety of expenditures from the account was performed by the University's general accounting department, the funds it contained were not public funds. We address each contention separately.

We note at the outset that defendant asserts that public money, as it appears in Section 30–23–3, is not defined by the legislature. Because the record reveals no challenge as to the constitutionality of the statute on vagueness grounds, we must only consider whether substantial evidence supports the finding below that the funds in the discretionary account are public money for purposes of Section 30–23–3.

■ Where the legislature fails to define a term in the criminal code, and nothing to the contrary appears, the legislature is presumed to have given the term its normal meaning. *State v. Benny E.,* 110 N.M. 237, 243, 794 P.2d 380, 386 (Ct.App. 1990). We have previously discussed misuse of public money and the purchasing of liquor with federal funds, where such funds were not made available for that purpose, and noted such purchases, dependent on proof at trial, may be a misuse of public funds. *See Vigil v. Arzola,* 102 N.M. 682, 690, 699 P.2d 613 (Ct.App.1983) (where plaintiff's cause of action required a showing that his discharge from employment contravened public policy, a showing that "unauthorized payment of salaries and the purchase of food and liquor from feder-

al funds" was committed by the superiors discharging plaintiff, the alleged misuse of public funds constitutes a prima facie contravention of public policy and raises a legitimate issue for resolution at trial). Discussions such as appeared in *Arzola* indicate our courts have not found "public money" to present other than a normal usage. The ordinary meaning of "public money" would have allowed defendant to conclude that the expenditures for which the discretionary fund was used might be impermissible. We conclude the term "public money," as used in the criminal code and discussed by our cases, is sufficiently specific to not require a person of ordinary intelligence to guess at the conduct the statute proscribes. *See State v. Najera,* 89 N.M. 522, 554 P.2d 983 (Ct.App. 1976).

### A. *Source of the Funds.*

■ In *State ex rel. Sego v. Kirkpatrick,* 86 N.M. 359, 370, 524 P.2d 975, 986 (1974), our supreme court noted that our Universities receive funds from sources other than our state legislature, including private individuals, and such funds are unlike funds appropriated by the state legislature because the state legislature has no authority to control the use of such funds through its appropriation power. The University Board of Regents has the authority to expend the funds as they see fit in order to, "do all the things, * * * which will be in the best interests of the institutions in the accomplishment of their purposes or objects."

The *Sego* opinion does not purport to curtail the legislature's police power authority to constrain the Board of Regents or other University officials from misappropriating public funds (which may arise from any source) or otherwise falsifying the nature of their expenditures. *Sego* limited the direct legislative control over University expenditures, as expressed through the appropriation power, to those funds the legislature itself had appropriated. Funds derived from other sources are the property of the University and are to be expended consistent with the regents' duties. *Id.* at

370, 524 P.2d 975. "The matter of expenditure or disbursement of these funds rests with the Boards of Regents, subject to applicable law." *Id.* In New Mexico, as a matter of law, funds made available to the University become public funds to be expended consistently with all of the regents' applicable legal duties, regardless of the original source of the funds. We conclude defendant may not rely on the source of the funds in this case to distinguish these funds from public funds. *See Storen v. Sexton,* 209 Ind. 589, 200 N.E. 251 (1936); AG Op. No. 67–128 (1967); AG Op. No. 62–9 (1962).

Having concluded the *source* of the funds in the discretionary account may not be relied upon to distinguish the discretionary account funds from public money, we next address whether the nature of the discretionary account itself, and not the nature of the items purchased with the funds, demonstrates the funds are impressed with the public interest.

### B. *Nature of the Account.*

■ Defendant attempts to distinguish the funds in the discretionary account from public funds on the ground that the discretionary account was not audited or controlled by the general accounting department within the University. Defendant alleges additional support for his contention is demonstrated by the fact that Dr. Koenig had complete "signatory authority" over the discretionary account.

The record does not reveal whether it is the only account at UNM for which one person within the system has signatory authority. In any event, we believe the question is, *for what purpose was the signatory authority given?*

If defendant believed Dr. Koenig was given signatory authority over the discretionary account funds because he was a member of the Lobo Club, then Koenig's decisions as to the fund would be the private decisions of a private person. However, if defendant believed the funds were made available to Dr. Koenig in his capacity as the athletic director of the University, then Dr. Koenig's decisions as to the fund would be the decisions of the athletic director, a publicly accountable figure. The actions of defendant in this case, as well as the stipulated facts, all point to defendant believing Dr. Koenig had signatory authority because he was athletic director.

Second, all expenditures by the athletic department, including those from the discretionary account, are processed through the University. The athletic department had previous problems with the general accounting department at the University because the accounting department questioned the validity of some of the athletic department's travel vouchers. The discretionary account was involved in some of the voucher disputes, though apparently not directly. Defendant admitted falsifying his voucher at dinner in order to circumvent scrutiny by the general accounting department. Because defendant was told by Dr. Koenig that a breach of University policy, which defendant knew to be a breach at the time, was permissible, cannot, standing alone, shield him from what would otherwise be his admitted culpability. This appears especially true since he admitted being on notice that the accounting practices of his department were questioned by the University's general accounting department.

Third, defendant's argument is untenable in its logical conclusion. If it were possible for any private entity to create an account filled with funds, give signatory authority to whatever University official that entity wished, and then direct that official to either expend the funds as the official wished *or* direct the official to expend the funds for purposes fulfilling the agenda of the private entity, the purposes of having *any* University policy on funding expenditures would be eviscerated.

It would be against public policy to allow a University official to enter into private agreements to expend funds made available only to pursue the agenda of the donating entity. *See Vigil v. Arzola,* 102 N.M. 682, 699 P.2d 613 (Ct.App.1983) (misuse of public money contravenes public policy). If our supreme court in *Sego* denied legislative control over such donated funds,

it is meritless to suggest that our court would sanction private, non-University control over the same type of donated funds.

To rule otherwise would mean any benefactor of the University could create a fund, give authority over the fund to a University official and claim the fund did not contain public money, thereby circumventing all University spending and accounting policies. This court cannot give its approval to schemes which are admittedly contrary to publicly determined University spending policy. To rule otherwise could open the door to the creation of a "shadow" University funded completely by "benefactors" unwilling to have the donated funds spent consistent with publically determined University policy.

Because defendant admitted knowledge of the general accounting department oversight, admitted intentionally falsifying the voucher in question, and offered no evidence that he relied on anything other than Dr. Koenig's representations and his own unexamined beliefs that the expenditures were permissible, we conclude that defendant's knowledge of the nature of the account sufficiently put him on notice that his actions, with respect to the account, related to public rather than private money.

Consistent with the above discussion, we also note that analysis of the nature of the account should not be read to mean that we believe all that was lacking in this defense is a strong evidentiary basis for finding the nature of the account (that is, the manner in which the account was handled) to be such that it was unfettered by normal University accounting policy. On the contrary, as a defendant charged under Section 30–23–3 builds the evidentiary record that the donated funds in the account in question are not public money, he also likely builds a record demonstrating his attempts to circumvent accepted University accounting policy. Under *Sego,* the funds donated to the University become public money and all efforts to avoid standard accounting policy regarding such funds in order to treat them as private funds is evidence of impropriety.

## C. *Nature of the Items Purchased.*

■ First, it is undisputed that defendant falsified the voucher out of which his conviction arises. His only argument is that the *purpose* for which the voucher was falsified was not to expend *public money.* Defendant's argument is meritless as a matter of law.

### 1. Whether Defendant Demonstrated the Funds Were Not for the Purposes of the Athletic Department.

Defendant concedes funds expended for athletic department endeavors are public funds. Defendant argues that, because the discretionary account traditionally was used to purchase items not authorized by University policy, such expenditures cannot be considered expenditure of public funds as contemplated by Section 30–23–3.

Defendant has introduced a reverse analysis which looks to whether the item purchased could be approved under usual University policy if the expenditure had been properly submitted and scrutinized by the general accounting department. This is meritless as a matter of law because the statute could never be enforced if defendant could allege that, because he intentionally falsified public vouchers in order to purchase items not approvable by the standard University accounting policy, he is immune to a charge of falsifying public vouchers because public money can never be expended for purposes other than approved purposes. Circumventing the standard approval process does not provide a defense to a charge under Section 30–23–3.

### 2. Can the Expenditure Itself Conclusively Demonstrate Whether the Expended Funds Are Public Money?

Defendant's final argument is that the item purchased must be examined to determine if the proscription contained in Section 30–23–3 has been violated. Defendant's argument is a seduction.

It cannot be the nature of the expenditure which determines the applicability of Section 30–23–3. If we rely on the nature of the *expenditure,* as defendant urges us to do (regardless of University policy on

the matter), to determine if the funds are "public money," then we produce absurd results. Any public official could falsify public vouchers for his own purposes and then defend himself by claiming the funds were not "public money" because they were not spent for a "public purpose." Obviously, such an analysis would lead to chaos. To read the statute as defendant has here urged would render its application a nullity and this we will not do. *See Consolidated Freightways v. Subsequent Injury Fund*, 110 N.M. 201, 793 P.2d 1354 (Ct.App.1990) (legislature presumed to not enact nullity).

## II. WAS THERE SUBSTANTIAL EVIDENCE SUPPORTING DEFENDANT'S CONVICTION?

Defendant argues his conviction must be reversed because the funds from which payment was made to him were private. *See* § 30–23–3. Since we have affirmed the trial court's determination that the discretionary account funds were public money, this argument is without merit. Additionally, our second calendar notice proposed to hold that there was sufficient evidence showing the requisite intent under Section 30–23–3. Defendant has not responded to our discussion of this issue. *See State v. Sisneros*, 98 N.M. 201, 647 P.2d 403 (1982). In any event, defendant's actions regarding the credit card slip was substantial evidence supporting the conviction. *State v. Lankford*, 92 N.M. 1, 582 P.2d 378 (1978). The trial court was not required to accept defendant's statement that he did not intend to defraud the University. *State v. Vigil*, 87 N.M. 345, 533 P.2d 578 (1975).

## III. DID THE TRIAL COURT ERR IN FAILING TO ORDER PRODUCTION OF UNIVERSITY RECORDS?

Defendant sought discovery of the Board of Regents Foundation Account records. The Foundation account was similar to the athletic director's discretionary account. Defendant sought these records to demonstrate that, like the discretionary account, the Foundation account was made up of private donations and was used for expenditures not authorized by statute or University policy. The trial court refused to order production of the Foundation account records.

The granting of discovery in a criminal case is a matter peculiarly within the discretion of the trial court. *State v. Bobbin*, 103 N.M. 375, 707 P.2d 1185 (Ct.App.1985). Defendant contends the trial court erred in this instance because the records were relevant to his defense insofar as they would support his contention that the University had various accounts, consisting of private donations, that were set up to be used for expenditures that were not authorized by statute or by University policy or procedures. He argues the records were relevant in that they would make it more probable than not that the discretionary account was set up for the purposes contended by defendant.

Even accepting defendant's argument, the existence of the Foundation account would not make it any more likely that the funds in the discretionary account were private, the core of defendant's defense. This being the case, we cannot say the trial court erred in refusing the requested discovery. *State v. Bobbin.*

Finally, we decline defendant's invitation to place this case on the general calendar although the appeal presents a question of first impression. Defendant has provided sufficient facts to allow this court to decide the appeal on the summary calendar, and the application of the legal principles to the facts is clear. *See Garrison v. Safeway Stores*, 102 N.M. 179, 692 P.2d 1328 (Ct. App.1984).

For the foregoing reasons, and those stated in the second calendar notice, defendant's conviction is affirmed.

IT IS SO ORDERED.

APODACA and CHAVEZ, JJ., concur.