1998-NMSC-020

962 P.2d 1236

The REGENTS OF THE UNIVERSITY OF NEW MEXICO, Plaintiff–Appellant,

v.

NEW MEXICO FEDERATION OF TEACHERS and American Association of University Professors, Gallup Campus, Defendants–Appellees.

No. 24716.

Supreme Court of New Mexico.

June 23, 1998.

Simons, Cuddy & Friedman, L.L.P., John F. Kennedy, Santa Fe, Charles N. Estes, Jr., Albuquerque, for Plaintiff–Appellant.

K. Lee Peifer, Albuquerque, Simon & Oppenheimer, Morton S. Simon, Linda M. Vanzi, Santa Fe, for Defendants–Appellees.

*OPINION*

FRANCHINI, Chief Justice.

{1} The Board of Regents of the University of New Mexico (UNM) appeals a determination by the Public Employee Labor Relations Board (PELRB) that invalidated portions of the university's labor-management relations policy. The PELRB held that the Public Employee Bargaining Act, NMSA 1978, §§ 10–7D–1 to –26 (1992, prior to 1997 amendment, effective Apr. 1, 1993) [hereinafter PEBA], requires all public employers, like UNM, to open the collective-bargaining process to all public employees except management employees, supervisors, and confidential employees. The PELRB held UNM's labor policy invalid because it excludes many categories of employees that PEBA includes. The PELRB's determination was affirmed by the district court. On appeal, UNM raises two arguments: (1) that its labor policy is exempt from PEBA under the Act's "grandfather clause," under which public employers whose labor policies were established prior to October 1, 1991 are released from the requirements of the Act; and (2) that PEBA conflicts with the Regents' constitutionally mandated autonomy in its governance of the university. We conclude that those portions of UNM's labor relations policy that exclude categories of employees in violation of PEBA are not grandfathered, and that PEBA does not conflict with the New Mexico Constitution. We affirm.

## I. FACTS AND PROCEEDINGS

{2} The University of New Mexico is a state institution whose management and control are placed by the New Mexico Constitution into the hands of a seven-member Board of Regents. *See* N.M. Const. art. XII, § 13 (as amended 1994). In May 1970, the UNM Board of Regents adopted a labor-management relations policy which authorized collective bargaining for several categories of UNM employees. *See* University of New Mexico, *Labor–Management Relations* (as revised April 16, 1979) [hereinafter *Policy* ]. This *Policy* was revised in April 1979 and again in 1980. (The record in this case included only the text of the 1979 version of

the *Policy*; there is no suggestion that pertinent sections of the 1980 version were materially different.) The *Policy* expressly excluded certain categories of employees from the bargaining process including "administrative, faculty and supervisory personnel" and "professional and technical personnel." UNM, *Policy* ¶ B, at 3–4. By the time of the first hearing in this matter, UNM had recognized and negotiated collective-bargaining agreements with four bargaining units representing approximately 1800 employees.

{3} Twenty-two years after UNM first adopted its collective-bargaining *Policy,* the New Mexico Legislature enacted the Public Employee Bargaining Act. *See* §§ 10–7D–1 to –26 (enacted by 1992 N.M.Laws, ch. 9). PEBA for the first time guaranteed to public employees the right under the law "to organize and bargain collectively with their employers." Section 10–7D–2. PEBA excluded "management employees, supervisors and confidential employees" from the collective-bargaining process. Section 10–7D–5. However, it opened the process to several categories of public employees that were explicitly excluded by the UNM *Policy. See* § 10–7D–4(P) (defining "public employee"); UNM, *Policy* ¶ B, at 3–4.

{4} One of the provisions of PEBA created the PELRB, whose function is the administration of PEBA. Section 10–7D–8 (creating the Board). The powers and duties of the PELRB included promulgating rules and regulations, § 10–7D–9(A), overseeing collective bargaining between public employees and their employers, § 10–7D–9(A)(1), (2), and enforcing the provisions of PEBA "through the imposition of appropriate administrative remedies," § 10–7D–9(F). *See generally* § 10–7D–9 (delineating powers and duties of the PELRB). PEBA forbade public employers, public employees, and labor organizations from engaging in a number of specific "prohibited practices" in conducting labor-management relations. Section 10–7D–19 (practices prohibited to public employers); § 10–7D–20 (practices prohibited to public employees); § 10–7D–21 (practices prohibited to labor organizations). The PELRB was responsible for hearing and de-

termining "complaints of prohibited practices" under the Act. Section 10–7D–9(A)(3).

{5} On March 10, 1995, the New Mexico Federation of Teachers (NMFT) filed a prohibited practices complaint with the PELRB, alleging violations of PEBA by UNM. *See* PELRB Case No. PPC 14–95(0) (March 10, 1995), *see also* Commencement of Case, Public Employee Labor Relations Board, 11 NMAC 21.3.8 (March 18, 1993) (procedures for filing prohibited practices complaint). The NMFT claimed that UNM's *Policy* barred the right of bargaining collectively to certain occupational categories whose inclusion PEBA required. The NMFT sought to represent non-faculty professional and technical employees.

{6} On the same day, the American Association of University Professors—Gallup Branch (AAUP) submitted a petition to UNM requesting recognition as the bargaining representative for teaching faculty, librarians, and academic counselors at UNM's campus in Gallup, New Mexico. On March 23, 1995, the Regents declined to accept this petition. The AAUP responded with a prohibited practices complaint, filed with the PELRB on April 26, 1995. *See* PELRB Case No. PPC 17–95(O); *see also* 11 NMAC 21.3.8 (procedures for filing prohibited practices complaint).

{7} Later the same year, three formal hearings were held before a PELRB hearing officer, on October 10, and November 12 and 13. *See* Prohibited Practices Hearings, Public Employee Labor Relations Board, 11 NMAC 21.3.16 (March 18, 1993) (mandating formal hearing in the absence of a settlement agreement). The complaints by the NMFT and the AAUP—who, in this opinion, we shall occasionally characterize as "the Unions"—were consolidated at these hearings. The hearing officer issued a decision and recommended order on March 6, 1996. *See* Decision and Order of the Hearing Officer, PELRB Case No. PPC 14–95(0) (NMFT complaint), PELRB Case No. PPC 17–95(O) (AAUP complaint) (Mar. 6, 1966) [hereinafter First Decision and Order]; *see also* Hearing Officer Reports, Public Employee Labor Relations Board, 11 NMAC 21.3.18 (March 18, 1993) (requirements for report by hearing officer).

{8} PEBA included a special provision for those public employers that, prior to October 1, 1991, had already voluntarily adopted a collective-bargaining system and had successfully negotiated collective-bargaining agreements with their employees. *See* § 10–7D–26(A) & (B). This grandfather clause permitted those public employers to continue to operate under their preexisting provisions and procedures. UNM argued that, under this grandfather clause, it was exempted from recognizing the Unions. The hearing officer disagreed, concluding that, "The UNM labor policy at issue is invalid insofar [as] it denies the rights to UNM faculty, professional and technical employees under PEBA to join, assist or refuse same with respect to any labor organization." First Decision and Order, at 12.

{9} UNM also argued that the interpretation of PEBA urged by the Unions conflicted with its Regents' constitutional authority to control and manage the university, and that, in such circumstances, the New Mexico Constitution must prevail. The hearing officer disagreed, concluding that "UNM's constitutional status does not prohibit the application of PEBA to it. PEBA has no direct impact on [the] duty of the Board of Regents of UNM to manage or control the [university]." *Id.*

{10} Further, the hearing officer held that UNM had committed a prohibited practice by its refusal to accept the AAUP's petition that it be recognized as the bargaining agent on behalf of the faculty, counselors, and librarians at UNM's Gallup Branch. *Id.* There was no similar holding with respect to the NMFT's complaint.

{11} The hearing officer recommended that the PELRB enter an order requiring "UNM [to] conduct an election to determine whether the AAUP shall be the exclusive certified bargaining unit representative of any eligible employees listed in the AAUP's petition who work at Gallup/UNM." *Id.* at 13. Finally, he recommended that the PELRB "issue [an] order invalidating that portion of UNM's existing Policy on Labor–Management Relations having to do with de-

nying faculty, professional and technical employees the rights guaranteed under PEBA to join [or] assist labor organizations for the purpose of bargaining collectively over working conditions or refusal of same." *Id.*

{12} As permitted by PELRB regulations, UNM filed a notice of appeal, on March 22, 1996, seeking PELRB review of the hearing officer's recommendation. *See* Appeal to Board of Hearing Officer's Recommendation, Public Employee Labor Relations Board, 11 NMAC 21.3.19.1 (March 18, 1993) (procedure for applying for Board review). Two months later, the PELRB issued its determination. *See* Decision and Order, 1 PELRB No. 18 (June 25, 1996). The Board adopted the hearing officer's conclusions of law on two issues:

1. That portion of the UNM labor policy at issue is invalid because it denies the right to form, join or assist a labor organization to the faculty, professional, and technical occupational groups and also denies the right for such occupational groups to refuse to engage in such organizing activities.

2. The constitutional argument does not foreclose the application of PEBA to UNM. The Act does not infringe on the regents' constitutional responsibility to manage or control the university.

*Id.* at 7–8. However, the PELRB concluded that the AAUP's petition to be recognized as the representative of the employees at UNM's Gallup Branch did not conform to the requirements of PEBA. *Id.* at 9–10 ("[T]he petition as presented to the regents appears to contemplate recognition of the AAUP as the exclusive representative for these positions without an election."). The Board therefore disagreed with the hearing officer and concluded that UNM had not committed a prohibited practice by refusing to accept the AAUP's petition to negotiate on behalf of the Gallup employees.

{13} As permitted by PEBA, UNM, on July 25, 1996, filed in district court an appeal of the PELRB's Decision and Order. *See* § 10–7D–23(B) ("Any person or party, including any labor organization affected by a final regulation, order or decision of the board or local board, may appeal to the district court for further relief."); Rule 1–074 NMRA 1998. Oral arguments were held in February 1997, and, on April 1, 1997, the district court entered a Decision and Order affirming all the conclusions of the PELRB. *See Regents of the Univ. of N.M. v. New Mexico Fed'n of Teachers,* No. SF 96–2069(C) (N.M. Dist.Ct. April 1, 1997).

{14} UNM appealed to the New Mexico Court of Appeals on April 28, 1997. We received this case by certification from the Court of Appeals as provided by NMSA 1978, § 34–5–14(C)(2) (1972), which permits the Court of Appeals to certify to the Supreme Court matters that involve "an issue of substantial public interest that should be determined by the supreme court." The Court of Appeals concluded that this case raised "issues of substantial public interest concerning public employee bargaining and the constitutional authority of the Board of Regents in relation thereto." *Regents of the Univ. of N.M. v. New Mexico Fed'n of Teachers,* No. 18,443 (N.M.Ct.App. Oct. 2, 1997) (Order of Certification to the New Mexico Supreme Court).

{15} We address two issues: Whether UNM, because it is accorded grandfather status by PEBA, can be compelled to recognize categories of employees that are excluded by its *Policy,* and whether PEBA conflicts with the Regents' constitutionally mandated authority to govern and control the university. We answer the first question in the affirmative and the second in the negative, and therefore, affirm.

## II. STANDARD OF JUDICIAL REVIEW OF ADMINISTRATIVE AGENCY DECISIONS

{16} The parties disagree about the standard of review that applies when appellate courts examine the determinations of administrative agencies. The Unions argue that this Court should not reweigh the evidence in the record and that we should accord great deference to an agency's legal determinations. *See Las Cruces Prof'l Fire Fighters v. City of Las Cruces,* 1997–NMCA–044, ¶ 12, 123 N.M. 329, 332, 940 P.2d 177, 180 [hereinafter *Fire Fighters I* ]. UNM, on the other hand, contends that we are not rigidly bound

by an agency's factual or legal conclusions, even when those conclusions concern an agency's area of expertise. UNM's interpretation is more in accordance with our recent statements on this matter. PEBA does set forth a common formulation:

> Actions taken by the board or local board shall be affirmed unless the court concludes that the action is:
>
> (1) arbitrary, capricious or an abuse of discretion;
>
> (2) not supported by substantial evidence on the record taken as a whole; or
>
> (3) otherwise not in accordance with law.

Section 10–7D–23(B). Very similar language appears in a recently enacted law whose purpose is to promote "uniformity with respect to judicial review of final decisions by agencies." *See* 1998 N.M.Laws, ch. 55, § 1(D), (E) (enacting NMSA 1978, § 12–8A–1 (1998)). Our cases have elaborated upon this formulation.

{17} On numerous occasions we have set forth standards of appellate review that, unless the Legislature determines otherwise, apply to all administrative agencies in New Mexico. It should not be necessary for us to repeat these standards for each individual agency as their determinations come before us for review. A recent description of the relevant general principles as they applied to a determination by the New Mexico Department of Labor, is, absent a statute to the contrary, applicable to all other agencies:

> "When reviewing administrative agency decisions courts will begin by looking at two interconnected factors: whether the decision presents a question of law, a question of fact, or some combination of the two; and whether the matter is within the agency's specialized field of expertise." *Morningstar Water Users Ass'n v. New Mexico Pub. Util. Comm'n,* [1995–NMSC–071,] 120 N.M. 579, 582, 904 P.2d 28, 31 (1995).

If an agency decision is based upon the interpretation of a particular statute, the court will accord some deference to the agency's interpretation, especially if the legal question implicates agency expertise. However, the court may always substitute its interpretation of the law for that of the agency's "because it is the function of the courts to interpret the law." *Id.* at 583, 904 P.2d at 32. If the court is addressing a question of fact, the court will accord greater deference to the agency's determination, "especially if the factual issues concern matters in which the agency has specialized expertise." *Id.*

When reviewing findings of fact made by an administrative agency we apply a whole record standard of review. *Duke City Lumber Co. v. New Mexico Envtl. Improvement Bd.,* 101 N.M. 291, 294, 681 P.2d 717, 720 (1984). This means that we look not only at the evidence that is favorable, but also evidence that unfavorable to the agency's determination. *Trujillo v. Employment Sec. Dep't,* 105 N.M. 467, 470, 734 P.2d 245, 248 (Ct.App.1987). We may not exclusively rely upon a selected portion of the evidence, and disregard other convincing evidence, if it would be unreasonable to do so. *National Council on Compensation Ins. v. New Mexico State Corp. Comm'n,* 107 N.M. 278, 282, 756 P.2d 558, 562 (1988).

The decision of the agency will be affirmed if it is supported by the applicable law and by substantial evidence in the record as a whole. *Kramer v. New Mexico Employment Sec. Div.,* [1992–NMSC–069] 114 N.M. 714, 716, 845 P.2d 808, 810 (1992). "Substantial evidence" is evidence that a reasonable mind would regard as adequate to support a conclusion. *Wolfley v. Real Estate Comm'n,* 100 N.M. 187, 189, 668 P.2d 303, 305 (1983). If the agency's factual findings are not supported by substantial evidence, the court may adopt its own findings and conclusions based upon the information in the agency's record. *Sanchez v. New Mexico Dep't of Labor,* 109 N.M. 447, 449, 786 P.2d 674, 676 (1990).

The party challenging an agency decision bears the burden on appeal of showing "that agency action falls within one of the oft-mentioned grounds for reversal including whether the decision is arbitrary and capricious; whether it is supported by substantial evidence; and whether it repre-

sents an abuse of the agency's discretion by being outside the scope of the agency's authority, clear error, or violative of due process." *Morningstar,* [1995–NMSC–071,] 120 N.M. at 582, 904 P.2d at 31. *Fitzhugh v. New Mexico Dep't of Labor,* 1996–NMSC–044, ¶¶ 21–25, 122 N.M. 173, 180, 922 P.2d 555, 562.

■ {18} To these principles we would add the observation PEBA was enacted so recently that it has generated very little jurisprudence in New Mexico. The Act has been addressed by only three other New Mexico appellate opinions: *Las Cruces Prof'l Fire Fighters v. City of Las Cruces,* 1997–NMCA–031, 123 N.M. 239, 938 P.2d 1384 [hereinafter *Fire Fighters II* ]; *Fire Fighters I,* 1997–NMCA–044, 123 N.M. 329, 940 P.2d 177; and *City of Las Cruces v. Public Employee Labor Relations Bd.,* 1996–NMSC–024, 121 N.M. 688, 917 P.2d 451. For this reason, our Court of Appeals has suggested that federal labor law provides a useful point of reference in developing the emerging law under PEBA. *Fire Fighters II,* 1997–NMCA–031, ¶ 15, 123 N.M. at 243, 938 P.2d at 1388. This is because much of the language in PEBA was derived from the National Labor Relations Act, 29 U.S.C. §§ 151 to 169 (1994) [hereinafter NLRA]. *Id.* Though we did not find it necessary in this opinion to refer to the NLRA, we agree with the Court of Appeals' conclusion that, "[a]bsent cogent reasons to the contrary, we should interpret language of the PEBA in the manner that the same language of the NLRA has been interpreted, particularly when that interpretation was a well-settled, long-standing interpretation of the NLRA at the time the PEBA was enacted." *Id.*

### III. THE GRANDFATHER CLAUSE

#### A. Statutes in Question

{19} Three categories of employees are excluded by PEBA from the right to bargain collectively:

> Public employees, *other than management employees, supervisors and confidential employees,* may form, join or assist any labor organization for the purpose of collective bargaining through representa-

tives chosen by public employees without interference, restraint or coercion and shall have the right to refuse any or all such activities.

Section 10–7D–5 (emphasis added). The Act defines "public employee" as "a regular, non-probationary employee of a public employer; provided that in the public schools, 'public employee' shall also include any regular probationary employee." Section 10–7D–4(P).

{20} The UNM *Policy,* in contrast, excludes many more categories of employees:

> B. *MEMBERSHIP AND REPRESENTATION*
>
> (1) Any permanent, full-time or part-time, staff employee of the University is free to join and assist any labor organization of his own choosing or to participate in the formation of a new labor organization, or to refrain from any such activities, *except however, administrative, faculty and supervisory personnel, professional and technical personnel, security officers and guards, confidential employees and employees engaged in personnel work, temporary part-time employees and temporary full-time employees* shall not be represented by any labor organization for the purposes of bargaining collectively with the University on wages, hours, or other working conditions.
>
> (2) The Rights described in Section B(1) do not extend to participation in or the management of a labor organization, or acting as a representative of any such organization, *where such participation, management or activity would be incompatible with the official university duties of an employee.*

UNM, *Policy* ¶ B, at 3–4 (emphasis added). This is the only portion of the UNM *Policy* that was expressly invalidated by the PELRB.

■ {21} PEBA contains a grandfather clause which exempts from some of the requirements of the Act those institutions that adopted labor-management policies before October 1, 1991. UNM argues that, because it instituted its *Policy* in 1970, it qualifies as a grandfathered institution. For this reason, UNM claims to be exempt from those por-

tions of the Act that would otherwise require it to recognize the employee categories represented by the NMFT and the AAUP. PEBA's grandfather provisions are set forth in the first two subsections of Section 10–7D–26:

    A.  Any public employer *other than the state* that prior to October 1, 1991, adopted by ordinance, resolution or charter amendment a system of provisions and procedures permitting *employees* to form, join or assist any labor organization for the purpose of bargaining collectively through exclusive representatives may continue to operate under those provisions and procedures.

    B.  Only a public employer other than the state or a municipality whose ordinance, resolution or charter amendment has resulted in the designation of *appropriate bargaining units,* the certification of exclusive bargaining agents and the negotiation of existing collective bargaining agreements may avail itself of the provisions set forth in Subsection A of this section.  (Emphasis added.)

The third subsection of Section 10–7D–26, delineates the requirements for a public employer whose policy is not grandfathered:

    C.  Any public employer other than the state that subsequent to October 1, 1991, adopts by ordinance, resolution or charter amendment a system of provisions and procedures permitting *employees* to form, join or assist any labor organization for the purpose of bargaining collectively through exclusive representatives freely chosen by its *employees* may operate under those provisions and procedures rather than those set forth in the Public Employee Bargaining Act [10–7D–1 to 10–7D–26 NMSA 1978]; provided that the employer shall comply with the provisions of Sections 8, 9, 10, 11 and 12 [10–7D–8 to 10–7D–12 NMSA 1978] of that act and provided the following provisions and procedures are included in each ordinance, resolution or charter amendment:

    (1) the right of *public employees* to form, join or assist employee organizations for the purpose of achieving collective bargaining;

    . . . .

    (4) the right of an exclusive representative to negotiate all wages, hours and other terms and conditions of employment for *public employees* in the appropriate bargaining unit;

    . . . .

    (9) prohibited practices for the public employer, *public employees* and labor organizations that promote the principles established in Sections 19, 20 and 21 [10–7D–19 to 10–7D–21 NMSA 1978] of the Public Employee Bargaining Act.

Section 10–7D–26 (emphasis added).

{22}  Though it was an issue when this case was initiated, there is, at this point, no dispute that UNM qualifies as a "public employer other than the state" under Section 10–7D–26(A).  The Legislature clarified this question with a recent amendment declaring that "[s]tate educational institutions, as provided in Article 12, Section 11 of the constitution of New Mexico, shall be considered public employers other than the state for collective bargaining purposes only."  Section 10–7D–4(Q) (enacted by 1997 N.M.Laws, ch. 212, § 1).

## B.  Grandfather Clauses Generally

{23}  Statutory limitations, like the one at issue in this case, under which UNM hopes to be absolved from recognizing the Unions, are variously termed "grandfather clauses," "saving clauses," "exemptions," and "provisos."  Attempts have been made to draw fine distinctions among these expressions.  However, courts and legislators seldom rigorously differentiate these terms.  *See* 1A Norman J. Singer, *Statutes and Statutory Construction* § 20.22 (5th. ed.1993) (stating that neither courts nor statutory drafters make consistent distinctions in defining these words).

{24}  These types of statutory provisions delineate a special exception from the general requirements of a statute.  *See State ex rel. Crow v. City of St. Louis,* 174 Mo. 125, 73 S.W. 623, 629 (1903) ("A saving clause is an exception of a special thing out of general things mentioned in the statute.").  The effect of these provisions is to narrow, qualify, or otherwise restrain the scope of the stat-

ute. *Stafford v. Wessel,* 321 Ill.App. 183, 52 N.E.2d 605, 606 (1943) (stating that the function of a saving clause or proviso "is to except some particular case or situation from a general principle or enactment"). They remove from the statute's reach a class that would otherwise be encompassed by its language. We shall refer to the limitation at issue in this case as a "grandfather clause."

{25} The intent of grandfather clauses is to save something that would otherwise be lost. *Bass v. Albright,* 59 S.W.2d 891, 894 (Tex.Civ.App.1933, no writ). These laws do not usually create rights or requirements, but rather prevent an entity from being altered or imposed upon by a new statute. *Knickerbocker Ice Co. v. Stewart,* 253 U.S. 149, 162, 40 S.Ct. 438, 64 L.Ed. 834 (1920) (stating that "[t]he usual function of a saving clause is to preserve something from immediate interference—not to create"). A grandfather clause preserves something old, while the remainder of the law of which it is a part institutes something new. A grandfather clause may have the effect of relieving an entity from submitting to new restrictions, or the clause may have the reverse effect of permitting the entity to avoid broadening the scope of its activities. The grandfather clause may extend prerogatives to those already receiving them, while denying those same prerogatives or imposing additional obligations upon the remainder of the class. *O.C. Taxpayers for Equal Rights, Inc. v. Mayor of Ocean City,* 280 Md. 585, 375 A.2d 541, 547 (1977).

{26} Grandfather clauses are deemed necessary because they prevent harm. *See Commonwealth Air Transp., Inc. v. Stuart,* 303 Ky. 69, 196 S.W.2d 866, 869 (1946). New statutory restrictions or requirements can, in many circumstances, impose hardships upon enterprises whose activities were well established prior to the law's enactment. By including grandfather provisions into a new law, the Legislature recognizes that there are classes of entities who could be damaged by the blanket and unrestricted application of new rules. *Cf. id.* (stating that grandfather clause prevents harm to established enterprises).

## C. Judicial Construction of Grandfather Clauses

{27} Generally, in resolving statutory ambiguities, courts will favor a general provision over an exception. *See State v. Christensen,* 18 Wash.2d 7, 137 P.2d 512, 518 (1943). This is especially true when a statute promotes the public welfare. *Wheeler v. Wheeler,* 134 Ill. 522, 25 N.E. 588, 590 (1890) ("It is familiar that if the words employed are susceptible of two meanings, that will be adopted which comports with the general public policy of the state, as manifested by its legislation, rather than that which runs counter to such policy."). Because of this judicial predilection, strict or narrow construction is usually applied to exceptions to the general operation of a law. *State ex rel. Murtagh v. Department of City Civil Serv.,* 215 La. 1007, 42 So.2d 65, 73–74 (1949). For this reason, a grandfather clause will be construed to include no case not clearly within the purpose, letter, or express terms, of the clause. *See United States v. McElvain,* 272 U.S. 633, 639, 47 S.Ct. 219, 71 L.Ed. 451 (1926) (A proviso "is to be construed strictly, and held to apply only to cases shown to be clearly within its purpose."); *United States v. Dickson,* 40 U.S. (15 Pet.) 141, 165, 10 L.Ed. 689 (1841) (Those who claim their case falls within the exceptions created by a statutory proviso "must establish it as being within the words as well as within the reasons thereof."). "In interpreting the exceptions to the generality of the grant, courts include only those circumstances which are within the words and reason of the exception." *Dalehite v. United States,* 346 U.S. 15, 31, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). When the scope of a grandfather clause is ambiguous, the court will construe it strictly against the party who seeks to come within its exception. *Teague v. Campbell County,* 920 S.W.2d 219, 221 (Tenn. Ct.App.1995).

{28} In establishing whether a party falls within the scope of a grandfather clause, courts will apply the rules of statutory construction that are appropriate in the interpretation of any statute. The principal objective in the judicial construction of statutes "is to determine and give effect to the

intent of the legislature." *State ex rel. Klineline v. Blackhurst*, 106 N.M. 732, 735, 749 P.2d 1111, 1114 (1988). We will construe the entire statute as a whole so that all the provisions will be considered in relation to one another. *New Mexico Pharm. Ass'n v. State*, 106 N.M. 73, 74, 738 P.2d 1318, 1320 (1987). "Statutes must be construed so that no part of the statute is rendered surplusage or superfluous ." *Western Investors Life Ins. Co. v. New Mexico Life Ins. Guar. Ass'n (In re Rehabilitation of W. Investors Life Ins. Co.)*, 100 N.M. 370, 373, 671 P.2d 31, 34 (1983). The complement of the preceding rule is that we "will not read into a statute or ordinance language which is not there, particularly if it makes sense as written." *Burroughs v. Board of County Comm'rs*, 88 N.M. 303, 306, 540 P.2d 233, 236 (1975). We will not depart from the plain wording of a statute, unless it is necessary to resolve an ambiguity, correct a mistake or an absurdity that the Legislature could not have intended, or to deal with an irreconcilable conflict among statutory provisions. *State ex. rel. Helman v. Gallegos*, 1994–NMSC–022, 117 N.M. 346, 351–52, 871 P.2d 1352, 1357–58.

### D. Legislative History

■ {29} In attempting to validate its interpretation of the grandfather clauses, UNM introduced evidence regarding PEBA's legislative history. UNM offered testimony from various members of the Governor's Task Force on Public Employee Collective Bargaining, a group of citizens that had engaged in the early drafting of PEBA. It also introduced the statements of an NMFT representative who purported to articulate what employee organizations expected during the drafting of PEBA. UNM even discussed early proposed versions of PEBA that were never enacted. None of this evidence is material, competent, or relevant.

■ {30} It is the policy of New Mexico courts to determine legislative intent primarily from the legislation itself. *United States Brewers Ass'n, Inc. v. Director of the N.M. Dep't of Alcoholic Beverage Control*, 100 N.M. 216, 219, 668 P.2d 1093, 1096 (1983). Unlike some states, we have no state-sponsored system of recording the legislative his-

tory of particular enactments. We do not attempt to divine what legislators read and heard and thought at the time they enacted a particular item of legislation. If the intentions of the Legislature cannot be determined from the actual language of a statute, then we resort to rules of statutory construction, not legislative history.

{31} It is true that, at least on one rare occasion, we looked to "contemporaneous documents submitted to and considered by the legislature at the time of enactment of the legislation." *Helman*, 1994–NMSC–022, 117 N.M. at 350 n. 4, 355–56, 871 P.2d at 1356 n. 4, 1361–62. However, even this tangible evidence can be of questionable probity in intuiting the Legislature's thought processes. The connection between a particular document and the final wording of a statute may be very tenuous.

■ {32} The statements of legislators, especially after the passage of legislation, cannot be considered competent evidence in establishing what the Legislature intended in enacting a measure. *United States Brewers Ass'n*, 100 N.M. at 218–19, 668 P.2d at 1095–96 (quoting *Haynes v. Caporal*, 571 P.2d 430, 434 (Okla.1977)). If the testimony of actual legislators is not recognized as competent, then statements from citizens who drafted early versions of legislation are even less competent. The same can be said of descriptions by labor representatives of what their constituents desired from a particular piece of legislation. Further, we can see no point in attempting to construct the language of statutory provisions that were never enacted. The exclusion of such provisions from the final statute tells us nothing dispositive about the Legislature's intentions; such exclusions are not even necessarily indicative of what the Legislature did *not* intend.

{33} We will therefore not consider any of the evidence presented by UNM regarding the "legislative history" of PEBA.

### E. PEBA's Grandfather Clauses

{34} PEBA sets forth two requirements a public employer must satisfy in order to obtain grandfather status. First, it must already have in place "a system of provisions

and procedures permitting *employees* to form, join or assist any labor organization for the purpose of bargaining collectively through exclusive representatives." Section 10–7D–26(A) (emphasis added). PEBA makes it clear that this system must be productive, actually resulting "in the designation of appropriate bargaining units, the certification of exclusive bargaining agents and the negotiation of existing collective bargaining agreements." Section 10–7D–26(B). Second, in order to be grandfathered, this system must be in effect "prior to October 1, 1991." Section 10–7D–26(A).

{35} We will construe this two-part test narrowly, holding that it applies to specific provisions of a public employer's policy rather than the policy as a whole. In other words, portions of an employer's collective-bargaining system may fail this two-part test while the remainder may qualify for grandfather status. We will address only those portions of UNM's *Policy* that are raised by the issues in this case; we express no opinion about the grandfather status of the remainder of the *Policy*.

{36} Public employers whose system, at least partially, meets these two requirements "may continue to operate under" the valid pre-existing "provisions and procedures." Section 10–7D–26(A). If a public employer does not fulfill these two requirements, it must conform to all the general provisions of PEBA. UNM's *Policy* was instituted in 1970 and easily satisfies the second requirement. The resolution of this issue turns on whether UNM's *Policy* fulfills the first requirement.

{37} There is no dispute that UNM has, since 1970, permitted some employees to "form, join or assist any labor organization for the purpose of collective bargaining through representatives chosen by public employees without interference, restraint or coercion." Section 10–7D–5. Further, with at least four groups of employees, UNM has negotiated successful collective-bargaining agreements. These accomplishments do not, however, settle the question of UNM's grandfather status.

### 1. "Public employees" versus "employees"

{38} In an effort to distinguish itself from public employers who do not merit grandfather status, UNM focuses attention on subsection (C) of Section 10–7D–26 which sets forth requirements for collective-bargaining systems established after October 1, 1991. UNM attempts to make much of the observation that this particular subsection—quoted above in paragraph 21—uses the term "public employees" in specifying who should be allowed to bargain with a non-grandfathered public employer. In contrast, UNM argues, the grandfather clause, Section 10–7D–26(A), uses only the general term "employees." Thus, UNM claims, employment policies established after October 1, 1991, cannot enlarge upon the three categories of "public employees" that PEBA expressly excludes from the bargaining process, those being "management employees, supervisors and confidential employees." Section 10–7D–5. However, UNM asserts that the use of the general term "employees" in the grandfather clauses means that UNM is not required to open the bargaining process to all "public employees" as they are defined under the Act. UNM seems to be saying that, even though it did not recognize all eligible "public employees" as mandated by PEBA, it has earned grandfather status by recognizing at least a few categories of "employees."

{39} Here, UNM is arguing that "public employee," a term that is specifically defined by PEBA, is distinct from "employees," a term which PEBA uses but does not specifically define. UNM has raised a legitimate ambiguity in the grandfather clauses. Under our standards of statutory review, this ambiguity will be construed strictly against UNM, the party that seeks to come within the grandfather exception. *See Teague*, 920 S.W.2d at 221.

{40} UNM's argument violates the statutory rule of construction that prohibits reading any language into a statute that is not clearly implicated by the actual words of the statute. *See Burroughs*, 88 N.M. at 306, 540 P.2d at 236. Under this rule of construction, it is more logical to conclude that, when

a term, comprised of more than one word, is expressly defined by a statute, and a shortened form of this term appears elsewhere in the statute in context similar to the use of the long form, and further, when the statute includes no separate definition for this shortened form, the court should presume that the two terms have one-and-the-same definition. Certainly, under such circumstances, the burden of proof rests upon the party that claims the two terms have different meanings. This proof may be established by employing the usual methods of statutory construction such as looking to the intent of the Legislature and interpreting the words in the context of the statute as a whole. *Cf. Klineline*, 106 N.M. at 735, 749 P.2d at 1114 (legislative intent); *New Mexico Pharm. Ass'n*, 106 N.M. at 74, 738 P.2d at 1320 (whole statute).

{41} UNM has failed to demonstrate that PEBA intends to distinguish between "public employees" and "employees." UNM offers no rationale for its peculiar implicit assertion that an act called the "Public Employee Bargaining Act" would regulate any employees other than "public employees." All the language of PEBA, taken as a whole, indicates that when the Legislature used the term "employees," it intended to refer only to "public employees" as they are defined and regulated under the Act. *See New Mexico Pharmaceutical Ass'n*, 106 N.M. at 74, 738 P.2d at 1320 (construe the statute as a whole).

{42} In fact, subsection C of Section 10–7D–26 actually uses both terms, contrary to UNM's claim that it discusses only "public employees." Furthermore, it uses both terms to set forth the requirements for a single class of public employers: those who are not grandfathered. Looking at the language of Section 10–7D–26(C), it is difficult to imagine how the statute could make any sense at all if the Legislature intended to distinguish between "employees" and the "public employees." For example, it would be senseless for this single statutory subsection to distinguish between these two terms when, on the one hand, it permits any public employer, after October 1, 1991, to adopt "a system of provisions and procedures permitting *employees* to form, join or assist any labor organization for the purpose of bargaining collectively through exclusive representatives freely chosen by its *employees*," § 10–7D–26(C) (emphasis added), and then, on the other hand, requires, in almost identical language, that this system include "the right of *public employees* to form, join or assist employee organizations for the purpose of achieving collective bargaining," § 10–7D–26(C)(1) (emphasis added). In this case, ambiguity and absurdity would be the consequence of departing from the apparent intention of the Legislature to use two slightly different terms to express a single idea. *Helman*, 1994–NMSC–022, 117 N.M. at 351–52, 871 P.2d at 1357–58 (indicating we will not depart from the language of a statute unless it is necessary to resolve an ambiguity or absurdity).

{43} When PEBA describes those who may collectively bargain as "employees," it refers to all public employees, except confidential, managerial, and supervisory employees, who work for a public employer other than the state. *See* § 10–7D–5; § 10–7D–26. Furthermore, this is the meaning that the Legislature intended when it used the word "employees" in the grandfather clause, Section 10–7D–26(A). Paragraph B of UNM's *Policy*, quoted in full above in paragraph 20, does not qualify for grandfather status under PEBA because it does not extend the right to bargain collectively to all employees who have been afforded this right under PEBA. Thus, this portion of UNM's *Policy* fails to meet the first requirement, mentioned above, that a public employer must satisfy in order to obtain grandfather status.

### 2. "Appropriate bargaining units"

{44} This conclusion is bolstered by other language from the grandfather clauses that recognizes only those policies that result in actual productive collective-bargaining agreements. Subsection B of Section 10–7D–26, requires that such policies result "in the designation of *appropriate bargaining units*, the certification of exclusive bargaining agents and the negotiation of existing collective bargaining agreements." (Emphasis added.) PEBA defines "appropriate bar-

gaining unit" as "a group of *public employees* designated by the board or local board for the purpose of collective bargaining." Section 10–7D–4(A) (emphasis added).

{45} UNM's *Policy* includes a definition of "appropriate bargaining unit" which is in direct conflict with PEBA's definition:

D. *DETERMINATION OF APPROPRIATE BARGAINING UNIT*

The University will be solely responsible for determining ... whether a unit is appropriate for purposes of exclusive recognition.

UNM, *Policy* ¶ D, at 6–7. UNM's definition is superceded by PEBA. Because UNM's grandfather status depends in part on whether it has designated "appropriate bargaining units," it would not be sensible to allow UNM's self-serving definition of this term to settle the grandfathering question.

{46} Thus, under PEBA, a grandfathered collective-bargaining policy must include "appropriate bargaining units." Section 10–7D–26(B). Reading this grandfather provision in the context of PEBA as a whole, a bargaining unit is "appropriate" only as defined by PEBA. Under PEBA's definition, these units must be comprised of "public employees." All classes of "public employees" as defined by PEBA must have the right to form bargaining units or the units will not conform to PEBA's definition of "appropriate bargaining unit." As discussed above, UNM's *Policy* does not recognize all classes of "public employees" as the term is defined in Section 10–7D–5 and Section 10–7D–4(P). Thus, UNM's *Policy* does not provide for "the designation of appropriate bargaining units." Section 10–7D–26(B). This failure on the part of UNM's *Policy* leads to the conclusion that Paragraph D of UNM's *Policy*, in which UNM defines "appropriate bargaining unit," is invalid and must also be denied grandfather status.

## 3. Public policy and the purpose of PEBA

{47} We noted above that grandfather clauses function to prevent harm. *See Commonwealth Air Transp.*, 196 S.W.2d at 869. Such clauses serve to mitigate hardship and injustice upon those who have engaged without statutory regulation in an activity before the statute was initiated. As we shall demonstrate in the second part of this opinion, UNM has offered no convincing evidence of any hardship or injustice it will suffer from opening the collective-bargaining process to an expanded number of employees. Lacking this evidence, it cannot claim it will suffer from the hardship that the grandfather clause was created to prevent.

{48} Finally, it is our intention in this analysis to determine and give effect to the intentions of the Legislature. *Klineline*, 106 N.M. at 735, 749 P.2d at 1114. In this case, it is important that any public employer's collective-bargaining policy conform to the purpose for which the Legislature created PEBA:

The purpose of the Public Employee Bargaining Act [10–7D–1 to 10–7D–26 NMSA 1978] is to guarantee *public employees* the right to organize and bargain collectively with their employers, to promote harmonious and cooperative relationships between public employers and *public employees* and to protect the public interest by assuring, at all times, the orderly operation and functioning of the state and its political subdivisions.

Section 10–7D–2 (emphasis added). Once again the Act makes clear that its very function is to extend the right to organize and bargain collectively to all "public employees" as they are defined by PEBA. It is entirely within the constitutional police power of the Legislature to require a public employer—even one that has a long-standing well-established employment policy—to expand the scope of employees to whom it must extend the right to bargain collectively. *Cf. State v. Spears*, 57 N.M. 400, 408, 259 P.2d 356, 361 (1953) (discussing the Legislature's "power to discriminate between persons already lawfully pursuing an occupation subject to the police power and persons who may thereafter seek to engage in the same business."). UNM cannot rationally argue that it should be immunized from the core purpose of the Act by denying the statutory collective-bargaining rights to all but a few of the thousands of its public employees.

{49} We conclude that, regarding UNM's grandfather status, the decision of the PELRB was neither arbitrary nor capricious, nor did the Board abuse its discretion in any way. *See Fitzhugh,* 1996–NMSC–044, ¶¶ 21–25, 122 N.M. at 180, 922 P.2d at 562; *Morningstar Water Users Ass'n v. New Mexico Pub. Util. Comm'n,* 1995–NMSC–071, 120 N.M. 579, 582, 904 P.2d 28, 31; *see also* § 10–7D–23(B) (standards of judicial review); § 12–8A–1 (same).

## IV. PEBA AND THE CONSTITUTIONAL AUTHORITY OF THE BOARD OF REGENTS

{50} The UNM Board of Regents exists because the New Mexico Constitution mandates that "[t]he legislature shall provide for the control and management of the university of New Mexico by a board of regents consisting of seven members." N.M. Const. art. XII, § 13. The Board of Regents is an independent governing body which has a very real, though somewhat ill-defined, independence from outside control. The Legislature has specified some of the Regents's powers:

> The board of regents shall have power and it shall be its duty to enact laws, rules and regulations for the government of the university of New Mexico. The board of regents may hire a president for the university of New Mexico as its chief executive officer and shall determine the scope of the president's duties and authority.

NMSA 1978, § 21–7–7 (1995). The reason for the Regents' autonomy is to assure that the educational process is free of interference from the capricious whims of the political process.

{51} This is not to suggest that the Board of Regents is exempt from the laws of New Mexico. *See Regents of the Univ. of Mich. v. Michigan Employment Relations Comm'n,* 389 Mich. 96, 204 N.W.2d 218, 223 (1973). As the Unions point out, the Board of Regents is subject to the Legislature's exercise of its police power. "The Legislature is the proper branch of government to determine what should be proscribed under the police power; a statute is sustainable as a proper exercise of that power if the

enactment is reasonably necessary to prevent manifest evil or reasonably necessary to preserve the public safety, or general welfare." *Alber v. Nolle,* 98 N.M. 100, 105, 645 P.2d 456, 461 (Ct.App.1982). The Board of Regents is not immune from statutes that further the public welfare and that are of statewide concern and general applicability such as the New Mexico Human Rights Act, NMSA 1978, §§ 28–1–1 to –7, 28–1–9 to –14 (1969, as amended through 1995), and the New Mexico Unemployment Compensation Law, NMSA 1978, §§ 51–1–1 to –58 (1936, as amended through 1997).

{52} However, legislation that intrudes upon the authority of boards of regents to determine educational policy will be struck down as unconstitutional. *Cf. Board of Regents v. Judge,* 168 Mont. 433, 543 P.2d 1323, 1331–35 (1975) (striking down, as unconstitutional violation of regents' authority, legislative attempts to intrude into budgetary decisions of university); *Board of Regents v. Baker,* 638 P.2d 464, 469 (Okla.1981) (striking down a statute that raised faculty salaries because it interfered with regents' constitutionally mandated independence and power to govern university). Similarly, the Legislature will appropriate funds for the university, but it is forbidden from taking direct control over those funds it has appropriated. *State ex rel. Sego v. Kirkpatrick,* 86 N.M. 359, 370, 524 P.2d 975, 986 (1974); *State v. Hearne,* 112 N.M. 208, 211–12, 813 P.2d 485, 488–89 (Ct.App.1991).

{53} UNM argues that its constitutional autonomy is violated by the PELRB's command that it open the bargaining process to all its employees except those excluded under PEBA. UNM is correct in pointing out that, when a legislative measure directly impairs the Regents's power to make decisions about the educational character of the university, the State Constitution becomes a restriction upon the measure's applicability. *See National Labor Relations Bd. v. Yeshiva Univ.,* 444 U.S. 672, 688, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980) ("The 'business' of a university is education, and its vitality ultimately must depend on academic policies that largely are formulated and generally are

implemented by faculty governance decisions"). UNM contends that the PELRB misinterpreted the Act so as to supercede the Board of Regents' constitutional power over educational matters. UNM argues that decisions about which categories of employees should be permitted to collectively bargain are central to the "control and management" of the university under Article XII, Section 13 of the New Mexico Constitution; as such, these decisions have a potentially profound impact on the educational mission of the university. The decisive issue before us is whether the enforcement of PEBA's collective-bargaining requirements upon UNM would violate Article XII, Section 13 of the New Mexico Constitution by infringing upon the autonomy of the Board of Regents in its "control and management" of the university.

{54} UNM describes a number of dilemmas that it fears will be raised by the enforcement of the PELRB's decision. UNM claims that it follows the practice of many universities of dividing the governance of the institution "between a central administration and one or more collegial bodies." *Yeshiva Univ.*, 444 U.S. at 680, 100 S.Ct. 856. In the case of UNM, the collegial body is the Faculty Senate. UNM asserts that, because virtually all decisions relating to the educational mission of the university are decided with significant input from the Faculty Senate, the introduction of collective bargaining among faculty members will have a significant negative impact. *Cf. id.* at 686, 100 S.Ct. 856 (discussing the absolute authority faculty members of Yeshiva University hold over academic matters). This is because, according to UNM, the collective-bargaining process is adversarial in nature, while the relationship between the university administration and the Faculty Senate is collegial, being based upon common interests and goals.

{55} Collective bargaining would also, according to UNM, undermine the role of faculty members in faculty personnel decisions. UNM postulates that, in questions of tenure or promotion, faculty members must evaluate one another independently and critically in contrast to unionized employees who tend to unite against management in support of one another. *Cf. id.* at 687, 100 S.Ct. 856 (discussing the conflict resulting when employees "divide their loyalty between employer and union"). In the same vein, UNM asserts that unionized employees seek "across-the-board" pay increases that directly conflict with the development of individual employment packages to attract "faculty superstars" who are important to the university's reputation.

{56} UNM claims that for all these reasons, collective bargaining would interfere with the influence faculty members assert over the university's educational mission. UNM seems to be suggesting that, because union activities would require faculty members to distance themselves from educational decisions, the role of the Faculty Senate would be correspondingly reduced.

{57} UNM's concerns are without merit. All of UNM's objections are speculations about what might occur. There is no concrete evidence to prove that the undermining of the collegial system of university governance is in any way inevitable. Moreover, in arguing that the collective-bargaining process is inherently adversarial, UNM expresses generalizations and stereotypes that have no basis in the specific facts of this case. Depicting these evils as if they were necessary results of PEBA is in direct contradiction to the Act's self-described purpose of promoting "harmonious and cooperative relationships between public employers and public employees" and protecting "the public interest by assuring, at all times, the orderly operation and functioning of the state and its political subdivisions." Section 10–7D–2. We find no necessary link between the requirement to bargain in good faith and the usurpation of the Regent's constitutional powers.

{58} UNM cannot demonstrate a logical connection between PEBA and the loss of its autonomy because it is not required under PEBA to accept any specific proposal. It always has control over the final outcome of any agreement. UNM need not fear that its financial autonomy will be undermined because PEBA only requires the university to "bargain in good faith." Section 10–7D–17(A)(1). There is no requirement about

which terms it must accept in an agreement; the university always has final say over the financial consequences of any negotiated settlement. *Cf. Hearne*, 112 N.M. at 211–12, 813 P.2d at 488–89 (discussing financial autonomy).

{59} Similarly, UNM need not yield to any employee proposal that legitimately interferes with the educational mission of the university. PEBA specifically guarantees that "neither the public employer nor the [labor organization] shall be required to agree to a proposal or to make a concession." Section 10–7D–17(A)(1). PEBA also explicitly states that it is setting no standards for a public employer's personnel decisions:

Unless limited by the provisions of a collective bargaining agreement or by other statutory provision, a public employer may:

A. direct the work of, hire, promote, assign, transfer, demote, suspend, discharge or terminate public employees;

B. determine qualifications for employment and the nature and content of personnel examinations; . . . .

Section 10–7D–6. PEBA simply requires that UNM "bargain in good faith." with its employees about the terms and conditions of employment and makes no specific requirements as to the outcome of any negotiations. *See* § 10–7D–17(A)(1).

{60} Undoubtedly, there will be circumstances in which a union might wish to bargain over a matter that UNM believes will implicate its constitutional power to set educational policy. In addressing similar issues, the Michigan Supreme Court explained that the question as to whether an employee's proposal will implicate the university's educational mission is dependent upon the specific facts of the situation:

Because of the unique nature of the University of Michigan [because of its constitutional autonomy] . . . the scope of bargaining by the [employees'] Association may be limited if the subject matter falls clearly within the educational sphere. Some conditions of employment may not be subject to collective bargaining because those particular facets of employment would interfere with the autonomy of the

Regents. For example, the Association clearly can bargain with the Regents on the salary that their members receive since it is not within the educational sphere. While normally employees can bargain to discontinue a certain aspect of a particular job, the Association does not have the same latitude as other public employees. For example, interns could not negotiate working in the pathology department because they found such work distasteful. If the administrators of medical schools felt that a certain number of hours devoted to pathology was necessary to the education of the intern, our Court would not interfere since this does fall within the autonomy of the Regents under Article VIII, section 5. Numerous other issues may arise which fall between these two extremes and they will have to be decided on a case by case basis.

*Regents of the Univ. of Mich.*, 204 N.W.2d at 224. Any potential intrusions into UNM's educational or academic policies can be addressed by the PELRB as they arise. PEBA specifically empowers the PELRB to "hold hearings for the purposes of . . . adjudicating disputes and enforcing the provisions of the Public Employee Bargaining Act." Section 10–7D–12(A)(3). In this way, PEBA functions to protect, rather than undermine, the constitutional autonomy of UNM's Board of Regents.

## V. CONCLUSION

{61} For the foregoing reasons, we affirm the district court's affirmance of the Decision and Order of the PELRB. UNM's *Policy* is invalidated insofar as it denies collective-bargaining rights to all public employees as they are defined by PEBA.

{62} **IT IS SO ORDERED.**

BACA, MINZNER, SERNA and McKINNON, JJ., concur.